CORTLAND COUNTY.—HON. A. P. SMITH,—SURROGATE.—AUGUST, 1874.

## SHAW'S WILL.

*In the matter of proving the last Will and Testament of* DANIEL J. SHAW, *deceased.*

Insane delusions on the part of the testator, as to any one of his relatives, are sufficient to avoid his will.

Apart from dementia, or loss of mind, the test of insanity as disqualifying a testator, is mental delusion, affecting the testamentary disposition. If a person persistently believes supposed facts which have no existence, except in his perverted imagination, and are against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under an insane delusion.

If such delusions relate to persons who at the time would naturally have been the objects of his testamentary bounty, and the court can see

that the disposing provisions of the will were or may have been caused or affected by the delusions, the instrument is not his will, and cannot be sustained.[*]

The fact that a testator entertaining delusions as to his relatives, gave them but $11,000, and gave the residue, of about $300,000, to his executors, in trust for such charitable purposes as they might determine, with an express clause of disinheritance, is cogent evidence of testamentary incapacity.

Evidence of delusions as to relatives is not countervailed by evidence of business capacity as to ordinary transactions.

If a testator, though having adequate business capacity, has the delusion that relatives for whom he would naturally provide are combining against him, or are impostors, or not related to him, or are his enemies, or are trying to take advantage of him, or get his property or injure him, and he refuses to be reasoned out of the delusion, and continues to believe in it against evidence and probabilities arising from their relationship, acquaintance and conduct, and the delusions are without foundation, in fact,—he is insane and his will cannot be sustained.

Evidence of the circumstances upon which an old man who had been the subject of delusions, was held also to have become incapacitated from all testamentary acts, whatever, by dementia.

THIS was an application to prove the will of Daniel J. Shaw. The facts are detailed in the opinion of the Surrogate.

WM. H. SHANKLAND, M. M. WATERS, and HIRAM CRANDALL, for the proponents.

MILO GOODRICH, O. U. KELLOGG, J. S. BARBER, E. A. WORDEN, and WM. E. HUGHETT, for the contestant.

THE SURROGATE.—Daniel J. Shaw, whose will and codicil have been presented to me for probate, died at Homer, Cortland county, on or about the 20th day of December, 1873, at the age of about eighty-eight to ninety years. The inventory of his personal property shows it to be worth something over $292,000, and his real estate is worth some $15,000, making in all, some-

---

[*] Compare Colhoun v. Jones ante p. 34; and for a case of alleged delusion not affecting the testamentary act, see Bonard's Will (16 Abb. Pr. N. S. 128 and cases cited.)

thing over $307,000. The will, dated February 8th, 1872, and the codicil, dated December 11th, 1873, together, give about $29,000 to his relatives, beside certain real estate, $1,000 each to two institutions in Auburn, $1,000 to Dr. Head, and the balance of $275,-000 to his executors, Hiram Crandall, James Douglass, and Aaron Sager. By a clause in the will, which is void, it is to be given to the two first named, to be given to such charitable and benevolent institutions as they shall deem proper. In the codicil, Sager is added as executor, and it is given to the three absolutely.

Mr. Shaw was a bachelor, and consequently left no legal descendents; but he left an only sister, aged about seventy-four years, living at Springport, Cayuga county, N. Y., and numerous descendents of deceased brothers and sisters, some residing in his vicinity, and others in different portions of the country, and several of whom had been, for considerable period of time, members of his family.

In former life, the deceased was a very intelligent and refined gentleman; not only thoroughly informed on the general topics of the day, but well versed and much interested in literature and literary institutions; very polite and circumspect in his deportment, and, in a word, conceded to be a thorough gentleman of the old school. He was a member of the constitutional convention of 1846, and was, at that time, and for a considerable time after, a leading citizen of the community where he resided. He was a careful, discreet business man; his business being confined chiefly, so far as the evidence shows, to the simple branch of money lending, in which business he became an adept. No man was keener to detect a flaw in the title, a lien which affected it, or any other defect which could endanger a security. By many years of practice in this branch of business, the detec-

tion of such defects became so much a habit, that he became so technical that in later years it made him . needlessly exact.

The evidence does not clearly disclose his character as to petulance and excitability in youth and vigorous manhood, except that it shows him to have been a polite and polished gentleman. But, for the last few years, he seems to have been very petulent, forgetful and peevish, and his habits of sleeping and eating very irregular. He became suspicious, and accumulated fire-arms of various kinds, so that eleven were found in his house after his death, the first one being so loaded as to burst, on being discharged. There were ten pistols—one so fixed as to be fastened upon the door, to be discharged by the entrance of any person from the outside. He had other weapons. In other words, he had become transformed from the gentleman of other years to the peevish, suspicious old child, which is often seen at ninety. For over forty years he was afflicted with a polypus, which much disfigured his face. It was removed about 1842, but returned soon after, and became malignant. From it were emitted much matter and disagreeable odors. He was very hard of hearing, was drowsy, and frequently fell asleep while talking with others, and for some time before his death, there was a marked failure in his physical and mental faculties. He nevertheless continued to do his business of money lending, collecting and keeping accounts, up to a few months of his death, conversing with considerable intelligence at times, not only on the subject of money lending, but of investments for colleges, etc., and writing sensible business letters and letters of miscellaneous correspondence. From 1870, he was attended much of the time by his relatives, Robert Tenant Shaw, and William H. Shaw, and others, who aided him in his business transactions. He

kept a diary of his transactions with a good degree of accuracy, for a man of his age.

Having no descendants, he at an early day conceived the idea of disposing of his property by will. As early as July, 1832, when he was about forty-seven years of age, he wrote his own will, by the terms of which all property was given to his relatives, and he provided for a family burying ground, in which all his relatives were expressly privileged to be buried. By this will he appointed two of his relatives as executors, with the direction to his sisters to nominate the third.

In January, 1837, when about fifty-two years of age, he wrote another will, though never fully executed, by which he appointed two executors, as before, leaving the third one to be named by his sisters who should survive him, and bequeathing all his property to his relatives.

In May, 1854, when about sixty-nine years old, he wrote and signed another will, giving his surviving brothers and sisters, or any two of them, the privilege of appointing his executors, and dividing his entire property into twenty shares, and giving the whole to his relatives. By this will he gave Robert Tenant Shaw one-twentieth part of his entire property. I mention the case of Robert Tenant Shaw, at this point, because he is still alive, and I shall hereafter have occasion to notice the change in his case in particular. In this will he bequeathed to William H. Harrison, an adopted child named by him, the sum of five thousand dollars.

On the third day of October, 1870, when he was in his eighty-sixth year, he executed another will, written by himself, by which he appointed Robert Tenant Shaw, with some other man, whose name is obliterated, as his executor. By this will he bequeathed to Robert Tenant

Shaw the sum of twenty thousand dollars, besides one thousand dollars and other compensation as fees for executing the will. Aside from a bequest of one thousand dollars each to the Home of the Friendless and the Orphan Asylum, both at Auburn, all the bequests in this will are to his relatives.

On the back of this will, but without date, is added in his own handwriting, the following, among other memoranda: "As I expect Robert Tenant Shaw to be at expense and trouble in carrying into effect this will, and keeping vaults, etc., in repair, and such other things as may be useful for the honor of the family, I have willed to him the largest sum of any of my heirs." In this will he gives Mrs Lowrey, his sister, ten thousand dollars. In this memorandum he also expressed an intention to name a benevolent purpose to which the residuum of his estate should be given. In this will he also bequeathed the farm of 150 acres, in Summer Hill, to Robert Tenant Shaw, in trust for the care of his vault, etc. Then in the memorandum, in the handwriting of deceased, but in different ink, and evidently written at another time, though at what time can not be ascertained from the paper, is the following memorandum: "Having satisfactorily discovered that Robert Tenant Shaw has, by lying and other shameless deceits and wrongs, deceived and injured me, I hereby withdraw all trust and confidence in him, and desire that he be excluded from inheriting any part of my property or estate, or having anything to do with the disposition of any part thereof, and desire that his name be erased from every part of the foregoing part of this will, where it is written, or given any part or thing to do with it." This memorandum is written below the foregoing one, expressing confidence in Robert T., and is followed by an attestation clause, beneath

which are the signatures of the deceased and the sub-
scribing witnesses.  It is worthy of remark that in all
these old wills, there were originally blank spaces left in
the body of the will, which from time to time were fill-
ed up by the testator, after execution, as his mind met
with a change.  They are also erased and interlined in
many places.  In all these wills he showed the most ten-
der regard and love for his family relatives, and partic-
ularly toward Robert Tenant Shaw, who the evidence
shows had been much in his family, and had materially
aided the testator for a long time in the transaction of
his business.  Letters in the handwriting of Daniel
J. Shaw, to Robert Tenant Shaw, have been produced,
written at different times, from 1848 to 1869, in which
the testator speaks in the highest and most endearing
terms of him as his beloved nephew.  The will of
1870 shows that this feeling was entertained at least
until the latter part of that year.  The only evidence
that the testator's suspicions had been aroused against
Robert Tenant, before the will of 1870, was a letter pro-
duced in the handwriting of the testator, directed to
Robert Tenant, but never sent, and found among the
papers of the deceased, after his death.  This letter
bears date on the 19th day of March, 1870, over six
months before the making of his will, appointing
Robert Tenant his executor, and giving him twenty
thousand dollars besides his fees, and expressing the
utmost confidence in him.  This letter makes about the
same charges against Robert Tenant with about the same
as the foregoing memorandum.  It was introduced with
the memorandum to show that the testator had some-
thing on which to let his judgment act in arriving at
the conclusion that Robert Tenant should be disinher-
ited.  But in my judgment, if its date is correct, it only
shows the vacillation and unfounded suspicions of an

old man who, after almost an ordinary life-time of close friendship and uninterrupted and implicit confidence in his nearest living relative except one, in March, distrusts him, and without cause, so far as the evidence shows, charges, or intimates that he is his enemy, and in the following October, forgets his suspicions of the March before, makes him the chief legatee in his will, giving as a reason that he expects him to do such things as may be useful for the honor of the family; then, soon after, adds a memorandum charging him with the same thing as before, and finally makes his will, February 8th, 1872, and his codicil December 11th, 1873, entirely disinheriting him. On the 8th day of October, 1872, the testator wrote his attorney: "R. Tenant Shaw, whom I suspect and rather believe is an imposter and not related to me, has behaved in such a manner as to utterly deprive me of any confidence in him, as truthful or honest," etc. This was over a year before the making of the codicil, and just eight months after making the will now contested.

He told Mr. Waters at the time he drew the will, that he had the idea that he (Robert) was a man fit to be trusted, but that he had lied about him, and that he found him to be a very bad man, and that he desired that his name should not appear in his will. He said he had found he could not be trusted, and he had disinherited him entirely.

Mr. Waters says: "He stated considerable. I think that he said that he was satisfied that R. T. Shaw had been opening his letters and substituting letters that were other letters in the place of those that had been written to him." It will be observed that this was February 8th, 1872, long before the vulgar letter now claimed to have been substituted, and to have furnished a reason for his suspicion. That is dated September 26th, 1872.

There is nothing in the evidence showing that there was any foundation for these charges, and of course if in his right mind, the testator well knew that Robert Tenant Shaw was not an imposter, but was the nearest relative he had on earth, save his only sister. The evidence shows that Robert Tenant had been uniformly kind and attentive to the testator, and I think the counsel for the proponents is mistaken, when he says there was something calling for the exercise of judgment on the subject of these charges. It is but the assertion of the belief of a fact, such as is always made by the insane, but furnishes no evidence whatever of the truth of the charges. It seems to me the evidence shows them to be entirely without foundation in fact. Certainly if there is any evidence justifying these suspicions, I have overlooked it in my examination of this case. It is proper to notice also in this connection, that at the time the codicil was executed the wicked scheme of sending the indecent letter of September 26, 1872, if it ever was sent, had been concocted and carried into effect by somebody, with the view of prejudicing the mind of the testator against Robert Tenant Shaw, and of inducing his discharge from the testator's service, which object it accomplished. Robert swears he never wrote nor heard of this letter until during this trial, and produces several respectable witnesses who are acquainted with his handwriting and who say it is not his. I can see no earthly reason why Robert Tenant Shaw should write such a letter, and it seems to me any man of sound mind would on the face of it have been satisfied that he never wrote it. Yet the proponents now claim that that letter justified the testator in writing Mr. Waters, soon after, that Robert was an imposter and not related to him. On the subject of undue influence, this letter and the wicked scheme which prompted it become impor-

tant. While considering the delusions as to Robert T., the evidence of William H. Harrison becomes material. He went to Cortland from Summer Hill, with the testator, in February, 1872, at the time the will in question was executed. He testifies that at that time the testator made charges against his sister, Mrs. Lowrey, and Robert Tenant Shaw, that they were combining against him and wanted to get his property. The evidence also shows that at a latter day he charged Robert T. and Miss Lacey, his house keeper, with a combination and conspiracy against him. This was in 1872. He told Mrs. Thompson, a witness for the proponents, that the last soup that Miss Lacey prepared, he thought Robert had put a little "kindness" in it, as he knew of arsenic being bought. He said he thought Robert had changed toward him from the time he learned he might live to one hundred and fourteen years old.

I may have omitted other evidence with reference to these charges against Robert Tenant Shaw; but I have quoted sufficient from the great mass of evidence, to show the character of these charges, which, from time to time, he made against Robert. There is no proof that justifies them, and they were doubtless entirely unfounded, and were but the delusions of an enfeebled old man who, in 1870, loved this nephew above all his other relatives, and yet through some influence not satisfactorily defined in the evidence, or through the weakness of a distempered brain he was suddenly transformed in the testator's imagination into a conspirator, and a person in no way related to the deceased. The law to be hereafter applied to this case properly describes and characterizes these delusions.

Having noted these charges and changes as to Robert, I might stop here in this investigation. For if the testator has insane delusions as to any one relative, it is

sufficient to set aside a testamentary disposition of his property. But this is an important case, both as to the amount involved and the time spent on the trial of it, and its importance leads me to consider the feelings of the testator towards his other relatives, as bearing upon this question of sanity.

As has been stated, the deceased left but a single sister, Mrs. Lowrey, of Springport, N. Y. She has been before me, and appears like a good, quiet, sensible old lady. In his former wills, Mr. Shaw had always remembered this sister, and in the will of 1870, had given her ten thousand dollars. The evidence shows that before making his will in February, 1872, the testator thought he had a vision in which his spirit was taken by an angel to the gate of heaven and shown the beauties thereof. He desired to enter, but was told that he must return to his old body and remain until he was one hundred and ten years old. Some say 114, and some 109. He seems at one time to have told his vision to this only sister, when he said she laughed at it, and as he believed, she told it to others. Mr. Waters testifies that when the will was drawn, he said she made derision of it. Prior to that time, the relations of this brother and sister appeared to have been uniformly friendly, and no reason so far as she is concerned, is shown for any suspicions or unfriendly feeling on his part toward her. But because she did not believe in his vision, he seems to have become offended at her, and in the will under consideration, he entirely disinherits her, giving that as a reason to Mr. Waters when drawing the will. Mr. Waters, himself, testifies that he thought this was a little strange, and told him so. In speaking of Mrs. Lowrey, Mr. Waters says of her, "A very fine person, I should say." The evidence shows that in addition to her offense of disbelieving the vision, the testator be-

lieved she was combining with Robert Tenant Shaw, to get the testator's property. Judging from the testimony in this case, and her appearance in court, nothing could be further from the truth. It was the mere delusion of a feeble old man, whose mind, once strong and vigorous, had become impaired by age and the diseases which afflicted him. This may not be all the evidence on the subject of his delusions, with reference to Mrs. Lowrey, but it is sufficient in my judgment, taken with the other facts in this case, to show that not only at the time of the making of the codicil, but when the will was executed in February, 1872, the mind of Daniel J. Shaw was filled with delusions as to the character, designs and conduct of this only sister and nearest relative. They were entirely unfounded, and yet seeming real to him, induced him, as was natural, if believed, to disinherit her, when his purpose through life, to ripe old manhood, had been to give her ten thousand dollars.

I now proceed to notice briefly his delusions and change of conduct towards his other relatives. It will be observed that in all his former wills, he had given his property to his relatives, showing a strong attachment for them. Mr. Waters says, when he drew the will, the testator said concerning them, "that he desired none of them should have any portion except what he gave them in that will, and desired it to be expressly stated to that effect. He stated generally that they had conducted themselves in such a manner as would lead him to think that they did not deserve it."

From April, 1870, to October, 1871, all of which was before this will or codicil was executed, Eugene Scott, an heir at law, and a son of a deceased relative, dearly beloved by the testator, kept house for him in Summer Hill. The evidence shows that the testator frequently charged Mr. Scott with poisoning him, for the purpose

of getting his property away from him.   This was when the testator was eighty-five or eighty-six years old.  Mr. Allen, a supervisor of the town, to whom he told these suspicions, endeavored to reason him out of it; told him it was absurd; that Eugene Scott could have no motive to poison him; but he still insisted that it was so, and evidently believed it.   To Mr. Howell, the justice of the peace, who had formerly lived in his family, he stated that the Scotts had poisoned him with slow poison.  He said they seemed to be in a hurry to get his property.  He thought he received his poison in his victuals.  As to his relatives, without specifying which, Mr. Howell says, "I have heard him state that his relatives seemed to be in a hurry to get his property.  I think at three different times."  He thought that they wanted him out of the way, so that they could get his property.

Eugene Scott testifies that the testator charged his (Scott's) wife, with poisoning his succotash, in 1871.  He (Scott) ate some of the succotash and there was no poison in it.  Mrs. Scott is dead.

Albert Hopkins and wife kept the testator's house from December, 1871, to March, 1872, and were there at the time this will was made.  While they were there, Mr. Shaw said he thought something had been put into his food; that it tasted queer, and he requested the Harrison boy to taste of it and see.  No poison had been put in.  Mrs. Hopkins states another fact which is corroborated by the boy William H. Harrison, that when Mr. Shaw returned from Cortland, at the time of making the will, he was under the influence of spirituous liquor; vomited and it emitted the odor of liquor.

In March, 1872, the testator moved to Homer, and was from that time until May, 1872, in the family of Mr. Stimson, whom he does not seem to have charged with poisoning him.  He got considerably excited there and

slammed the door and talked to himself in a dissatisfied
tone, as Mrs. Stimson says. He was forgetful, and lost
things, and once when he lost a search, rather intimated
that everything was not quite right, though Mrs. Stim-
son says she can not say that he charged her to her face
with having stolen it.

From the last of April, or fore part of May, 1872, un-
til October, 1872, Miss Fidelia Lacey was his house-
keeper. She was an unmarried women about sixty-three
years of age. She testified that he was at times pleas-
ant and agreeable, but on being contradicted, became
violent. That Robert Tenant and she anticipated his
every want, and did all they could to make it pleasant
for him. He had a habit of wiping his nose with his
hand, and then feeling of the potatoes in the common
dish, from which the others used. Miss Lacey placed
two dishes of potatoes on the table, one for him and
the other for the other members of the family. " He
said there was some iniquity in that." When Miss
Lacey and Robert talked together at the table, he asked
if there were two "baboons at the table jabbering. He
was excitable and jealous of this old lady and Robert,
and tied a string to her door at night, to detect any one
entering her room, and finally falsely charged her with
tampering with his mail and poisoning him, at which
she left. He afterwards, to Mrs. Thompson, charged in
substance that Miss Lacey, under the influence of Robert,
had mixed poison in his medicine, which he tasted and
threw away. He said he did not feel safe or happy
during her stay in his house, she was so much in league
with Robert.

The next housekeeper was Mrs. Jane Thompson. She
was there from October 3d, 1872, until March 4th, 1873.
She is a lady of more than ordinary ability, and gave
clear and intelligent evidence ; and, in the view I take

of her testimony, it is all the more important because she was brought from New York city, to testify in behalf of the proponents. She says the old gentleman was intelligent—talked intelligently, but she says, "He would get talking about his relatives. He always spoke well of this young man here (William), but, speaking of the others, he said they would rob him if they could; that they would pick his eyes out of his head." On her cross-examination, she said : " The first conversation he had with me was as to what a scoundrel Robert T. Shaw had been. He said that he had robbed him, and he said that Miss Lacey had been very disagreeable to him, and he was glad she had gone, and he told how disagreeable his other relatives had been to him. He did not speak of them as being combined against him, but every one of them that had been around him, how foully they had dealt with him. But William was always mentioned by him as the choice of his relatives, and he always complimented him when he went out. He said he was one among a thousand that would do as he did. William was himself kind to him." There is no foundation whatever, shown in the evidence, for these suspicions as to Robert, Mrs. Lowrey, or any of the others. The evidence shows that they had been uniformly kind and considerate in their treatment of him.

His next housekeeper was his grand niece, Catherine Scott. She came in March, and left in July, 1873. The evidence shows that she was the daughter of a deceased relative of the testator, who was considered by him as his favorite sister, and he expressed himself very warmly in favor of Catherine Scott. She is an educated, highminded young lady, and he told Mrs. Thompson that Catherine was welcome to stay as long as she pleased. But she had been there only three or four months before he charged her with poisoning him in his coffee, when

of course she left his employ. When reasoned with on the subject, he persisted in the assertion that she had poisoned him, and this without the least foundation in fact. On the back of the will now offered for probate is the following memorandum in the testator's hand-writing: "Codicil No. 1. Being disgusted by the ingratitude and (some word unintelligible) course of Catherine Scott, she shall not benefit by any property I may have got at my decease."

William H. Shaw drank from the same coffee which the testator thought had been poisoned, and was not affected, and were that not so, had no test been made, no one in his right mind, knowing Miss Scott, would believe for a moment that she was capable of such an act. The testator repeated this accusation against Miss Scott, down to a short time before his death, and seemed to believe it.

After Miss Scott left, in July, 1873, the only house-keeper the testator had, for about two and a half months, was Adelbert Scott, her brother, a little boy about fifteen years old. To him the testator repeated the accusation of poisoning against Catherine.

From October 3d, 1873, to the death of Mr. Shaw, Mrs. Mary Brandow acted as his housekeeper. On the subject of poisoning she says: "He said they (Dr. Bradford and William H. Shaw) wanted to poison him with a glass of wine, and I said, 'For what?' and he said, 'To get me away and get my money,' and he got a suspicion of Dr. Bradford, and dare not go to sleep, and I sat up all night long, and said, 'I will take care of him,' and he did not get to sleep that night until after two o'clock, and he said I was the only one he could depend upon, &c." She further says he offered her $5 to sit up and watch with him one night. He felt tickled, in the morning, that he was alive. This was before the codicil was

executed. She further describes his conduct and conversation, showing that beyond a doubt he was insane at that time. This is evidence given by a legatee, who is to receive $500 if this codicil is sustained, and nothing if not, and being against her interest entitles it to additional weight as evidence. Dr. Jewett says that as far back as 1871 the testator made charges to him against Mrs. Scott, of poisoning him, for the purpose of putting him out of the way. He said he did not like to live in fear of his life constantly. He appeared in earnest, and proposed to go home with the doctor if he could keep him. The doctor, after hearing the statement of Shaw, did not believe there was any ground for the suspicion, and no sane man would.

Notwithstanding his high opinion of William, so often expressed by the deceased, and his intention to do well by him, as testified to by Snell, and the high character of Dr. Bradford, than whom it is conceded no man stands higher for integrity and moral worth, they both became the objects of this suspicion of poisoning, and were discharged before the making of this codicil. In relating his feelings to Mr. Waters, he said : "I asked Dr. Bradford, and I asked to have the neighbors called, and I think Dr. Bradford's reply was that he was not acquainted with the neighbors there. I said, ' Is this a country in which a man is permitted to die like a cat in a strange garret ?' They didn't seem inclined to call anybody; there seemed to be a combination between them." He said, " It seemed as if I couldn't get anybody except those that were combined against me." Dr. Bradford had practised medicine nearly fifty-five years, in Homer, near where Mr. Shaw lived, and could not have made that remark ; and the witnesses detailed what was said and done ; none of them mentioned such a thing as being said by Dr. Bradford or any one else.

It may be that I have overlooked some of the charges of conspiracy and poisoning contained in the vast amount of evidence before me. I know that other witnesses have spoken with reference to them, and many facts and circumstances point in the same direction; but enough has been stated to show that before the making of either the will or codicil, now under investigation, the testator's mind was filled with delusions with reference to his nearest relatives, and others who should have been trusted by him.

For the present, I leave out of consideration all evidence of loss of faculties, further than that affecting the question of delusion, choosing, rather, to consider the delusions, as to which there is no conflict of evidence, and see if the will and codicil can be sustained in that view alone.

Another fact should perhaps, be stated here, as bearing upon the condition of the testator's mind at the time, more particularly, of making the codicil, and with such force as an afterward proved fact should have upon the will itself. All the evidence shows that the testator had a strong dislike of Dr. Head. Whether such dislike was founded in reason or not, does not clearly appear, and is not important. According to the evidence of Mrs. Thompson, Mr. Shaw considered Dr. Head a snake in the grass. When he was in Shaw's room, Shaw would come out into the kitchen and shut the door, and say he was tired out by that man, and he wished he would go away She says she knew Shaw had no confidence in him. He once went in and found the doctor writing in his room, when he seized him by the arm and said, "What are you doing?" A number of times when the doctor went into his room, the testator would leave the table and go in as though watching him. He once said to Head, when he came near him, "Sit back; I don't

feel safe in your presence !" and other similar remarks, showing he did not like him. This continued while Mrs. Thompson remained there. But a little over a week before this codicil was made, for some reason which is unexplained, Dr. Head was taken into the confidence of Mr. Shaw, when the charge was soon made by Shaw that Dr. Bradford, who had visited him frequently for a year and nine months, and with whom he had visited and ridden out, had, with William, been guilty of poisoning him. He saw vines growing out of Dr. Bradford, which satisfied him that he had poisoned him, and they were both discharged, and Dr. Head made his physician. The codicil was made in eight days after, and Dr. Head was made a legatee to the amount of one thousand dollars, and that not in payment for his services, which are still a charge against the estate. This sudden conversion of a dying old man to Dr. Head, whom he so despised and dreaded, and seeing vines darting out of his physician, Dr. Bradford, being simultaneous, is to say the least, a remarkable coincidence. It seems to call for an explanation, which Dr. Head has not given. From that time until the codicil was made, Dr. Head was very attentive to Mr. Shaw, considering him, as he told Dr. Hyde, his patient, and was conveniently in the adjoining room when the bequest of $1,000 was made to him. At this point I cite, *Seaman's Friend Society* v. *Hopper*, (33 *N. Y.*, 619,) as bearing on this case, and also *Tyler* v. *Gardiner*, (35 *N. Y.*, 559) ; *Forman* v. *Smith* (7 *Lans.*, 443).

The law starts out with the presumption that every man is sane. That is the normal condition of mankind, and when the acts of a person, whether in making a deed, a contract, a gift or a will, are assailed, on the ground of insanity or incompetency, that insanity or incompetency must be shown by the person alleging it,

by sufficient evidence to overthrow the legal presumption. This principle is elementary. (*Delafield v. Parish*, 25 *N. Y.* 97 ; *Matter of Forman*, 54 *Barb.* 275 ; *Tyler v. Gardner*, 35 *N. Y.*, 559 ; 4 *Keyes*, 10.)

But when delusions are shown before the execution of the instrument, naturally affecting its provisions, the burden is shifted upon the proponents to show that they did not exist when the instrument was executed. (1 *Paige* 171 ; 5 *Johns.*, 159 ; 4 *Cow.* 207 ; 4 *Bradf.*, 226.)

It is another principle of law that no matter how wilful, stubborn, or obstinate a man may be, if he be sound in his mind, he may make a will and dispose of his property as he pleases. The question in such cases is, did the conduct result from insane delusions, which is insanity. (*Matter of Forman*, 54 *Barb.*, 274.)

Again, if a man has delusions, which in no way affect the disposition of his property, he may still make a valid will. (*Stanton v. Wetherwax*, 16 *Barb.*, 263.)

And so, though he may have exaggerated and absurb opinions, which do not affect his mind in the direction of the disposition of his property. (1 *Redf.* 89, 90 and 142 ; 21 *Barb.*, 197 ; 54 *Barb.*, 274).

"Setting aside dementia or loss of mind and intellect, the true test of insanity is mental delusion. If a person persistently believes supposed facts which have no real existence, except in his perverted imagination and against all evidence and probability, and conducts himself however logically upon the assumption of their existence, he is so far as they are concerned, under a morbid delusion ; and delusion in that sense is insanity. Such a person is essentially mad or insane on those subjects though on other subjects he may reason, act and speak like a sensible man." (*Dew v. Clark*, 3 *Add. ecc. R.* 79.) If the deceased in the present case was unconsciously laboring under a delusion as thus defined, in respect to

Robert Tenant Shaw and the testator's sister, Mrs. Lowrey, and his other family connections, or as to the two named alone, they being persons who would naturally have been the objects of his testamentary bounty "when he executed his will, and the court can see that its testamentary provisions were or might have been caused or affected by the delusion, the instrument is not his will, and cannot be supported as such in a court of justice."

The conduct and designs which he imputed to his nephew, sister and relatives were such as, upon the assumption of their existence, should have justly excluded them from all share in the succession to his estate. I have taken the last proposition almost literally from the opinion in *Seaman's Friend Society* v. *Hopper* (33 N. Y. 619.) as showing the view of the court of appeals on a similar state of facts. This view of insanity is taken by Drs. Gray, Hammond, Kellogg and all the other medical experts called in the case on both sides. And what gives more weight to their opinions is the fact that there is no substantial difference in their opinions on this question. In the clear and concise language of Dr. Gray, " Delusion is the very essence of insanity." Under the evidence in this case, can there be any doubt that there was delusion in the belief that Robert Tenant Shaw, who had for many years been in intimate relations with the deceased, was " an impostor and not related to" him ? Is there anything tending to justify the suspicion that Robert Tenant Shaw had "by lying and other shameful deceits and wrongs deceived and injured" him ? If so, why did he afterward take him into his family and employ only to turn him off again with a further charge of poisoning ? Is there anything proved in this case showing any cause for the suspicion that Robert and Mrs. Lowrey were combined

to get his property?   I have searched in vain to find it in the evidence in this case.   And yet that delusion and all those delusions existed at the very time when this will was executed.   And for the most part of it we have Mr. Shaw's own writing as proof.

It is no answer to say that Mrs. Lowrey was remembered in the codicil the same as in old wills, and therefore these delusions as to her cannot effect the will, because they have not changed the result.   If when the will was made he had a delusion which would naturally affect the disposition of his property, the will is not his will, and will not be sustained by the courts (*Cotton* v. *Ulmer*, 6 *Am. Repts.* 703).   Nor is it any answer to the objection made to the codicil that Mr. Shaw had shown by his will that he intended to exclude Robert Tenant Shaw, antecedent to the delusions which were more fully developed just before the making of the codicil, because he would not have been included in the codicil had those latter delusions never existed.   This is expressly held after full discussion in the case last cited.   The reasoning of the court in that case is such as to commend itself to my mind, as sound law.   It has been well said in New Hampshire: "The will of a person affected by insane delusions ought not to be admitted, if he has disinherited his family without cause, or looked on his relations as enemies; has accused them of seeking to poison him, or the like; in all such cases where the delusion exercises a fatal influence on the acts of the person affected, the condition of the testamentary power fails, the will of the party is no longer under the guidance of the reason, it becomes the creature of the insane delusion." (*Pitcock* v. *Potter*, 8 *Am. R.*, 190, *note.*)

As bearing on this question of delusions as to his relatives, it is important that the testator does not by his will and codicil show a mere preference between rela-

tions or objects of his bounty. With an estate of over $300,000, he gives about $11,000 to his relatives and not knowing what he would do with the balance, he bequeathes it to his executors, in trust for such charitable purposes as THEY shall determine. His purpose seems to have been to deprive his relatives of it even, though he had no choice where it should go. Others were to furnish the judgment, to say what should be done with the fruits of his labors and privations for almost a century. He instructed his draughtsman, Mr. Waters, to insert an especial disinheriting clause as to his relatives, which he did; and to my mind that and the residuary clause give more conclusive evidence of his insanity than any number of witnesses who might speak from appearances alone. Then by his codicil he increases the bequests to his relatives to about $29,000, and certain real estate, with $2,000, to two societies, and $1,000 to Dr. Head, in all $32,000 or one-tenth of his estate, and then says the residue shall go to his executors absolutely. If he knew what he was about when he signed this codicil, he intended to take about $275,-000 from his relatives, where it would naturally go, and give it to three persons in no way related to him, and to whom he was under no special obligations either legally or morally, to believe that he would do which, in his sane moments, is overtaxing human credulity. It is opposed to all the natural instincts, which in sane men favor relatives in preference to strangers. On the assumption that he, as a literary, charitable, and benevolent man, intended to bestow on those objects, this codicil shows on its face that he had not the capacity to comprehend what he was doing. What charitable, benevolent, literary, or religious society or institution could lay any claim to this large fund, or any part of it, were it to pass into the hands of these executors, under either

the will or codicil ?   Taken together, the will and codicil
are simply a disinheriting document, showing that if he
comprehended what he was doing, it must have been
prompted by the worst of feelings toward his family,
which is confirmatory of the theory of delusions.  (*Mar-
vin* v. *Marvin*, 4 *Keyes*, 22 ; *Peck*, v. *Cary*, 27 *N. Y.* 9.)
The fact that this will disinherits most of the nearest
kindred and relatives, is a very strong circumstance to
show that the testator was not in possession of all his
faculties, so as to appreciate what he did within the rule
laid down in *Delafield* v. *Parish* (25 *N. Y.* 9.) and *For-
man* v. *Smith*, (7 *Lans.* 447.)

As we have seen by his former wills, the testator
gave all his estate to his relatives.  As Judge Miller,
speaking for the court, says (7 *Lans.* 450, of opinion) :
" He thereby recognized their claims upon him, and
that he then retained toward them the affectionate re-
gard which was due to the ties of consanguinity which
bound them together."  This change, whereby he takes
it from its natural course—from the course he all along
intended—and gives it to strangers in blood, without
providing even for the objects which it is claimed he
had in view, is very strong evidence of his incompetency.

It is no answer to this claim of insanity that he was
able to do his accustomed business even accurately, and
converse intelligently, to near the date of codicil.  All
the medical experts tell us, what is but confirmatory of
our own observations, that the insane, outside of the
subject of their delusions, can transact their accustomed
business as well as ever.  This does not apply to cases
of profound dementia, for there the faculties are entirely
worn out and destroyed.  In the first stages of dementia
the subject may do his accustomed business from mere
force of habit; but when profoundly demented he can-
not.  Where, however, delusions exist, so that the sub-

ject is what is commonly known as a monomaniac, there is no loss of power to do his ordinary business not connected with his delusions. If he is a mechanic, he will do mechanical work well, though he may have the delusion that he is Jesus Christ. If he is a money-lender, he will let money, examine securities, and make memoranda, though his house may be filled with. pistols to ward off the relatives who are combining against him for his property. But in the one case, he would not be permitted to bequeath his mediatorial seat to his relatives, and his worldly and more substantial property to others, nor in the other, to give the tenth part of his property to certain relatives and nine-tenths to strangers in blood. If a man is insane—which is evidence, by delusions—he cannot dispose of his property, if such disposition may be controlled by such delusions. Where the testator has the delusion that his relatives, or any of them, are combining against him, or that they or any of them are impostors or not related to him, or that they are his enemies, or are trying to get some advantage of him or to get his property, or to injure him in any way, and he refuses to be reasoned out of the delusion, and continues to believe in it against evidence and probabilities arising from their relationship, acquaintance and conduct, and the delusions are without foundation in fact, he is insane, and his will will not be sustained by the courts.

I have thus far considered some of the evidence bearing upon the question of insane delusions. There is one other question which has occupied much of the time of the court, and as to which a large number of witnesses have given their testimony. Was the testator, at the time of making this will and codicil, or either of them, so profoundly demented as to be incapable of making a will? This, to my mind, presents a more diffi-

cult question than the other, especially so far as the will is concerned, chiefly because of the conflict of evidence.

Dr. Gray defines dementia as a "state of enfeeblement of the mind or impairment of the mind. Dementia is usually the result of the other forms of insanity." It is an unsoundness of mind as much as mania, and when it is profound, it is more likely to affect the entire mind.

All the facts in this case taken together, satisfy my mind that when this codicil was made on the 11th day of December, 1873, nine or ten days before his death, the testator had become profoundly demented. He was at that time nearly, or quite, ninety years of age—twenty years beyond the allotted time of man. He had been some considerable time sick with what has been called his last sickness. He had had sinking spells, the day before, and telegrams and letters were sent to his relatives, to come and see him, for he was dying. He had so far lost his mind, that some time before, he had seen vines growing out of his physician and, out of the wall, and believed that the vines growing out of his physician indicated that he had poisoned him. He had become entirely thoughtless and careless as to his appearance, sitting with his clothes unbuttoned and his person exposed in the presence of ladies, without any concern. In his habits in his bed, on the floor, and in his clothes, like a young child, making it necessary to clean and care for him like an infant, and when this was done by a female, he showed no more embarrassment than a child. He would use his hands, and then rub his face in a most disgusting manner not fit to be described. When the codicil was drawn, he did not know the name of the woman who had cared for him and been his chief companion for over two months, and whom he had called by her given name, Mary, for all that time. She says, " After William left, (December 3d, 1873,) he

run down awful fast." His bed had to be changed a dozen times in a day and night. For a long time before the codicil was made, he would sit at the table and permit the dripping from his polypus to drop into his soup, or milk, or tea, or on his plate and he did not notice it but kept on eating as though nothing had occurred. He would wipe these drippings from his nose with his hand, and then pinch all the potatoes in the dish, from which others ate, and take cakes from the common dish with the same hand regardless of its nauseating effect upon others. He would drop $200 or $300 on the floor at a time, and forget it. He had a safe in his house for the deposit for valuables, and yet so demented, so forgetful, and careless had he become, that after his death the small fortune of over six thousand dollars in bonds was found packed away in an unusual place with old and worthless papers, the coupons not having been cut for a considerable time, and evidently forgotten; and an inventory of bonds found among his papers, and the evidence given, show that but a short time ago he had a large quantity—over $50,000 of bonds which are unaccounted for and unfound. He neglected the interest on his securities for the last two or three years. He was forgetful, and would say a thing, and the next moment forget all about it, even in speaking for a drink. William was as kind to him as he could have been to his own father, and yet he believed that William had poisoned him. He believed he saw handbills on the wall when there were none there. He thought he was being poisoned by Dr. Bradford and offered Mrs. Brandow $5 to sit up and watch by him through the night. He said to Mrs. Brandow "You would not be such a wretch as that" (to poison him.) He said he dared not to go to sleep because he was afraid Dr. Bradford would poison him: he said he was feeling tickled to think he found himself alive in

the morning, and many other like things; he, without appearing to notice the difference, signed the codicil by the residuary clause of which about $275,000, attempted to be given by his will to his executors in trust for charitable and benevolent purposes, was given to his executors absolutely for, their own use, and this without any comment or suggestion from him, as to any change; and while he clung to the key to his safe to the last, showing that " the ruling passion is strong in death," yet he permitted two men, five days before the codicil was made, to take his entire property from his safe and to carry it away uncounted and uninventoried and without even taking a receipt for it, or anything to show who had taken it, or what they had taken.

The circumstances above stated occurred before the execution of the codicil, and proves to my mind very conclusively that he was then profoundly demented, and incompetent to make a testamentary disposition.

In *Forman* v. *Smith*, (7 *Lans. R.* 443), the general term in this district held: "To enable a person to dispose of his property by will, it is not enough that he should be found to be possessed of some degree of intelligence and mind; he must in addition, have sufficient mind to comprehend the nature and effect of the act he is performing." (See also *Delafield* v. *Parish*, 25 *N. Y.* 9; *S. C.*, 1 *Redf.*, 1.)

The doctor tells us that when a man is once profoundly demented with senile dementia, he does not recover. I have not mentioned the facts connected with the refusal to cut the willows, the painting of the house, the killing of the hog, nor the seeing of the vision; because the doctors disagree, or, at least, some of them say they are not of much value in determining this question of sanity. None of the questions as to the effect of his doing his business arise in discussing this codicil, for he ceased to

do business for some time before that instrument was executed; and Dr. Hammond, the witness for the proponents, says, a man may be competent to do business one day, and dementia may begin the next, and be noticed soon after. I am satisfied that on either ground —insane delusion or dementia—this codicil cannot be sustained. He was, on the 11th day of December, too far gone, to be permitted to make a disposition of property.

I am not so clear that he was profoundly demented when the will was executed, on the 8th day of February, 1872. The evidence is very conflicting upon that question. Many witnesses speak of his condition before that time, and more soon after, and describe the testator as anything but fit to do business. This is testified to by men who did business, or attempted to do business, with him. He was evidently far down the decline of life; was weak in body, and, to some extent in mind; he was filled, as we have seen, with delusions; his house was an arsenal of fire-arms; he was, at times, peevish, and would not bear contradiction; there was a marked change observed in his habits, from neatness and propriety, to slovenliness; he did not observe the proprieties of life as formerly, and he did many foolish and filthy things.

But I was much impressed by the evidence of Chanlor Winchell, Bishop Peck, and Profs. French and Bennett, as to his intellectual conversations, outside of his ordinary business. They are keen observers, and high-minded, intellectual men. They are accustomed to mingle with and weigh men, and are above the suspicion of bias. They say he showed remarkable intelligence, for a man of his age, on the subject nearest their heart, the endowment of literary institutions. He promised to do something for the Syracuse University,

and seemed much interested in it, and this case would have presented quite a different aspect, had he carried out his intent in the codicil.  He wrote business letters after the will was executed, which are produced before me in his own handwriting.  He carried on his large business transactions for over a year, at least; some of the time having aid from Robert Tenant and William, but doing much of it himself.  Over a hundred people—men and women of character, have testified to having done business with him.  Some say he did it well, and some say he knew next to nothing.  I think from all this evidence I should not be authorized to say that he was so profoundly demented when the will was made, as to render it void.  Were that the only question in the case, I should be disposed to sustain the will, but not the codicil.  In my view, as before shown, however, the will, too, is void, by reason of his insane delusions and mania.

I am cited by the counsel for the contestants to the case of *Seaman's Friend Society* v. *Hopper* (33 *N. Y.*, 619) and asked to hold on the authority of that case that the only parties present at the drawing of the codicil, being beneficiaries under it, and other persons having been excluded, the codicil is void for fraud and undue influence.  Much time on the trial and argument was consumed on that question.  But I decline to enter upon a discussion of it, further than I have already hinted.  There is much that might be said, but if this case goes to the upper courts, the facts of this and the law of that and other cases will be before the court, the one to be applied to the other as to the court shall seem proper.  They will not fail to characterize it properly.

I have examined this case with all the care which its importance to individuals and the public seems to demand, and I am thoroughly satisfied that neither the will nor the codicil is the act of a man who had what

the law terms testamentary capacity, and that such want of capacity has led the testator to attempt to transfer this large property from its natural channel to three persons not related to him.

The probate of both should be refused.

Decree accordingly.