## ESTATE OF WILLIAM C. HINCKLEY.

No. 7036—July 28, 1878.

WILL.—DISTRIBUTION.— BEQUEST IN TRUST FAILING BY REASON OF DEATH OF BENE-FICIARY.

A bequest to trustees of a sum of money, the principal and income to be applied in their discretion for the benefit of a beneficiary who dies subsequently to the testator, but before any distribution, falls to the heirs at law or residuary legatee.

The words constituting a person residuary legatee "of all my estate not hereinbefore devised and bequeathed," are to be construed as passing to such person a legacy which has lapsed in the manner and for the reason above stated.

Expenses to which the trustees of such bequest have in good faith been subject should be paid out of the trust fund and the residue to the residuary testamentary heir.

October 3, 1878.

JURISDICTION OF PROBATE COURT.—DEVISE.—DISTRIBUTION.—CREATION OF TRUST.— The Probate Court has jurisdiction, in cases of devises or bequests which may or may not be illegal, either as creating improper trusts or otherwise, to pass upon the question of their validity; and, finding them invalid, in whole or in part, to distribute the property affected by the illegality either to the heir at law or person otherwise entitled.

DISTRIBUTION SUBJECT TO MORTGAGE.—A parcel of real estate covered by a mortgage may, should the devisees so request, be distributed to them subject to the mortgage, provided the mortgage creditor waives all recourse to any other portion of the estate for the satisfaction of his claim; and such mortgage debt shall, upon such distribution, in so far as the estate and executors are concerned, be treated as a cancelled liability.

PERPETUITY.—A devise coupled with power to alienate cannot be considered void as creating a perpetuity.

UNCERTAINTY IN DEVISE IN TRUST FOR CHARITABLE PURPOSES.—Such devise is expressly authorized under Sec. 1313, C. C., and it appearing that the *mode* of execution is left to the "wisdom, faithfulness, and discretion" of the trustees, and that the object of the trust is the advancement of the cause of beneficence and charity, the devise cannot be considered uncertain as to the beneficiaries, since by the discretion of the trustees, aided, it may be, by a court of equity, that which is indefinite may be rendered certain.

THE LIMITATION OF ONE-THIRD OF HIS ESTATE IMPOSED UPON A TESTATOR AS TO HIS CHARITABLE BEQUESTS *by Sec.* 1313, *C. C.*, means one-third of the gross value not the net value after payment of debts.

TRUSTEE AS PURCHASER OF CLAIM UPON THE FUND.— There is nothing antagonistic to the trust in the purchase by a trustee of a mortgage upon the trust property. Construing sections, Const., (old) Art. XI, 16; (new) Art. XX, 9; C. C., 1313; C. C. P., 1665, 1678.

*C. E. Royce,* for E. B. Badger and others.

*E. D. Sawyer,* for heirs at law.

*Lloyd Baldwin,* for residuary legatee.

*S. H. Phillips,* for executors.

Testator directed the executors to pay to E. B. Badger and two others $3,000 in trust, that they apply the principal and income for the benefit of James Campbell according to their discretion.

Testator died April 11, 1876, and James Campbell died August 21, 1876. Testator left him surviving heirs at law, who are still living.

E. B. Badger and others applied for the distribution to them of the $3,000 mentioned in the will, claiming that upon the death of testator the right to the legacy became vested, and the subsequent death of Campbell did not defeat the bequest.

By the COURT: The object and purpose of the trust has ceased and determined, and the effect of the bequest falls with the purpose. The purpose was that the $3,000 and its income should be for the sole use and benefit of James Campbell during his lifetime, and no equitable estate of inheritance was intended to be created. The petition is denied; but it being intimated that the trustees incurred liabilities in consequence of the trust before the death of Campbell, they may make proof thereof and present the same for future consideration.

Subsequent proceedings were had by which the sum of $500 was directed to be paid to reimburse the trustees for liabilities incurred before Campbell's death; leaving $2,500 of the legacy undisposed of.

The heirs at law filed a petition that the $2,500 be adjudged to belong to them.

E. D. SAWYER:   The $2,500 belong to the heirs: Miss Hinckley is residuary legatee "of all my estate not hereinbefore devised and bequeathed." The item of $3,000 *was* thereinbefore bequeathed, viz: to the persons in trust for Campbell, which removed that sum from the residuary clause, even if by a subsequent event the bequest should fail in being carried into effect. As the legacy failed subsequently to death of testator, this money was not in effect bequeathed, and goes to the heir.

2 Redf., 117; 5 N. Y., 409; 7 Hill, 352.

LLOYD BALDWIN:   This money goes to the residuary legatee.   68 Penn. St., 84; 40 Conn., 250; 17 Md., 23; 4 Vesey, 708; 4 Kent, 541.   Testator took the $3,000 out of the estate for James Campbell *only* and only for his life; and when that object fails, it goes under the residuary clause. Courts are against partial intestacy.   4 Paige, 117; 2 Coll. Ch., 516; 8 Vesey, 24; 30 Ind., 292; 45 N. Y., 254; 3 Yates (Penn.) 187; 6 Paige, 607; 1 Dana, 206; 4 Vesey, 708; 5 Vesey, 501; 2 Madd. Ch., 94.

By the COURT:   The heirs are not entitled to the money; it goes under the residuary clause to Miss Hinckley. Whatever was not given for Campbell was given to her.   He having a life interest only, all except that life interest went under the will.   Upon the death of Campbell the money could not be paid to the trustees, the object of the trust having failed.

October 3, 1878.

*Stephen H. Phillips*, for executors.

*Doyle & Barber*, for the residuary legatee.

Testator died April 11, 1876, leaving an estate valued in the inventory, filed June 5, 1876, at $135,269.50; of which, the California Theatre property was valued at $120,000.

The debts have all been paid, except a debt presented by the Hibernia Savings and Loan Society for $37,500 and interest, which has been allowed and approved.   This claim

has been assigned to and is now held by F. H. Woods, one of the trustees hereinafter named, and by an instrument filed herein by him dated June 8, 1877, he states that the amount then due was $37,500, and he relinquishes all claim against any property of said estate except the California Theatre property, which was mortgaged to secure the debt.

All the legacies have been paid except those hereinafter mentioned.

The trustees hereinafter named now ask distribution of the California Theatre property to them upon the trusts named in the will, which is resisted by Mary H. Hinckley, the residuary legatee and devisee.

The following are the clauses in the will relating to the subject in controversy:

"I give the property known as the California Theatre property, being the property now subject to a lease to H. P. Wakelee, [recorded, Liber 28 Leases, page 172, to which reference is had], for a term of years, and which lease is a part of the conditions under which this bequest is made, together with all rights which move to me or my heirs and assigns under or by virtue of such said lease, to the following named persons, my fellow citizens and members of the First Unitarian Society of San Francisco aforesaid, viz: Horatio Stebbins, C. Adolphe Low, Horace Davis, George C. Hickox, Stephen H. Phillips, Frank H. Woods, Louis H. Bonestell, Charles A. Murdock, John C. Merrill, and John H. Madison [the last named to have no successor], in trust, nevertheless, for the following purposes:

"To pay to my relatives hereinafter named, that is to say, [naming twelve persons], three thousand dollars each, from the income of the said property under the lease aforesaid, or from the capital amount paid by the lessees under said lease for the property, if said lessees choose so to pay it according to the terms of said lease.   *   *   After the payment of these bequests as herein provided, the remaining part of the California Theatre property, either under the lease or in capital amount paid by the lessees, as the case may be, shall be devoted to the establishment of a perpetual fund, to be called the William and Alice Hinckley Fund, the

income of this fund to be devoted perpetually to Human Beneficence and Charity; and while I do not wish to set arbitrary limits to the wisdom, faithfulness, and discretion of my trustees, desiring as I do to foster Religion, Learning, and Charity, I wish to call their attention to the trials and afflictions of the industrious, striving, unfortunate poor, and especially to the aged, the infirm, and the lonely. I wish also, to show my interest in good learning, and my sympathy with honorable and striving young men, to set apart from the income of this fund the sum of three hundred dollars per annum, to be known and designated as the Hinckley Scholarship, to be given to some worthy, talented, industrious, and needy young man, who is pursuing liberal studies, either in the University of the State or in any other school, as the trustees shall name."

The will provides a mode of selecting successors to the members of the board of trustees; and requires the trustees to report annually its condition and their doings under the will to the trustees of the First Unitarian Society of San Francisco.

"Finally, I dedicate this fund established by this will, in my own name and in the name of my beloved wife, to the interests of religion, learning, and charity; and I desire by it to express my sympathy with my fellow-men and my humble faith in God, the father and friend of all."

The residuary legatee, in resisting the petition for distribution, makes the following points, among others:

1—The debt to Woods is still outstanding; distribution of an estate cannot be had until all the debts are paid; the Court has no power to distribute, subject to a mortgage lien.

2—The charitable devise is utterly null and void, not being within section 847 of the Civil Code.

3—The will attempts to create a perpetuity, which is not authorized by the law of this State.

4—The charitable trust is void, for uncertainty, both as to the form or mode of the charity, and as to the beneficiaries for whom it is designed.

13

5—The direction to set apart $300 per annum for the Hinckley scholarship is null and void, because it is not a trust permitted by our statute; it creates a perpetuity; no right of selection of a person to be benefited is given.

6—The devise for charitable uses is void, as to the excess over one-third of the estate. From the aggregate value at death, deduct the debts; one-third of the residue is the legal limit of a charitable devise.

The trustees, besides replying to the points made by the residuary legatee, interpose the suggestion, that it is unprofitable for this Court to inquire into the mode of administering the trust, which must ultimately fall under the supervision of a Court of Chancery; it is enough for a Probate Court to know that there is something for trustees to do, although some of the trusts may be invalid, and although after some duties may have been performed, a trust may result in favor of a residuary legatee.

In reference to this suggestion, it may truly be said that it would be unprofitable for this Court to inquire into the mode of administering the trust, which may (not necessarily must) fall under the supervision of a Court of Chancery; but it *is* profitable, it is not only the province, but it is, under our system, the necessary province of a Probate Court, to inquire and determine whether a valid trust has been created. The mode of administering, the power to regulate and direct its subsequent administration, is quite separate and distinct from a question of whether a legal trust is expressed. So, in regard to whether all the objects of the trust are legal or not. Sec. 1665, C. C. P., provides that "the Court must proceed to distribute the residue of the estate * * among the persons who by law are entitled thereto." A trustee of a devise takes no estate unless there is a legal, valid trust created. The trust attempted to be created may be legal in part and illegal in part. This Court in making distribution must determine how far the trust is legal and how far illegal. The decree of distribution, founded upon the will, is the warrant or charter of the trustees, and by it the general objects of the trust are expressed.

To illustrate by an extreme case (and by extreme cases principles are frequently better illustrated), suppose a will gave $10,000 to A. B., in trust that he expend one-half of it in supporting and educating C. D., a minor (an object clearly legal), and one-half of it to establish a gambling or other house of vice (the illegality of which no one doubts), can it be said that the Probate Court, because there is one good object, must distribute to the trustees the whole $10,000, and leave the heir at law to a Court of Equity to have a resulting trust in his favor declared? Clearly not. The distribution must be to those "who by law are entitled thereto;" the trustee is entitled to that portion of the property only which is to be devoted to objects recognized by the law, and to the extent only that they are recognized. Therefore, in the case at bar, this Court must determine what objects expressed in the will are valid in law, and to what extent, and distribute accordingly.

The objection of the residuary legatee that the estate cannot be distributed until the Woods debt shall be paid, is not good. The creditor is willing that the estate should be distributed, subject to his mortgage; the trustees, who take the legal title, are willing; it does not rest with the residuary legatee to make the objection, especially as in 1877 she applied for and obtained, as a partial distribution, the residence devised to her, and in her petition stated the facts, that Woods held the debt and had released the balance of the property of the estate. Woods, in taking the assignment of the debt and mortgage, is not within the prohibition of Subdivision 1, Sec. 2,230, Civil Code. The transaction was not "adverse to the beneficiary." The debt already existed, and its purchase by him may have been for the very purpose of preventing a foreclosure and sacrifice of the interest of the estate. She appears to have been fully advised of the whole transaction.

The next objection is, that the charitable devise is null and void, not being within Sec. 847 of the Civil Code.

Upon the argument, it was contended by the Trustees that the Statute 43 Elizabeth, well known as the Statute of Charitable Uses, is in full force in California, and is the

principal source of the Law of Charities; and that the objects named in that statute as charitable are known to our law as charities; and that in case of a devise or bequest for charitable uses, if the purpose named in the will cannot be carried out, a Court of Chancery will apply the doctrine of *cy pres*, and select such objects as, in its opinion, shall be as near as may be to the object expressed by the testator.

In Ould *v.* Washington Hospital, 5 Otto, 309, the Supreme Court of the United States say that the opinion prevailed extensively in the country for a considerable period that the validity of charitable endowments and the jurisdiction of courts of equity in such cases depended upon that statute; but that idea has since been exploded, and has nearly disappeared from the jurisprudence of the country; that the statute was purely remedial and ancillary; it provided for a commission to examine into abuses already existing; the statute was silent as to the creation or inhibition of any new charity, and it neither increased nor diminished the pre-existing jurisdiction in equity touching the subject.

Bouvier in a note says that the main object of the statute was to distinguish between those objects which had been before the Reformation deemed superstitious.

The statute has not been re-enacted or generally followed in the United States. In Virginia and New York, it has been repudiated. In Georgia, Massachusetts, and some other States, it has been acted on. And this will account for the fact that the decisions cited on the argument from the New York and Massachusetts reports are so directly opposite.

The statute has never been enacted or adopted in California; at most, it merely defined what should be deemed in England at that time to be charities. Several of the objects named therein as charities would not be sustained now in this State as such; for instance: for repair of churches; for marriage of poor maids; for redemption of prisoners or captives; for ease and aid of poor inhabitants concerning payment of fifteenths. What objects shall be deemed to be charitable, change with the condition of society. As for instance, the noted Jackson will case in Massachusetts (14

Allen, 576), by which will money was bequeathed to aid in the abolition of slavery; but as slavery was subsequently abolished, the object of the intended charity no longer existed. So, in regard to religion. By the law of this State, all persons are protected in the enjoyment of their own particular religious views; but no particular system of religion is especially sustained. Suppose a devise to be made in aid of religion. If the question were asked, What is religion? who shall authoritatively answer? Who can tell what the testator meant? The Catholic has his view, the Greek another, the Protestant many, and they all join in condemning that of the Koran. Religious corporations can be formed and may exercise functions as such; but no such corporation can take under a will.

Civil Code, Sec. 1275.

In this State religious corporations are not deemed charitable.

We must look to our own law and to the present condition of things here to determine what objects are charitable. Without attempting to define all that may be held to be charitable objects, such objects will certainly embrace the indigent, sick, deaf, dumb, blind, orphans, unfortunate poor, the aged, the infirm, the lonely, the young persons striving for education, colleges and schools, and their instructors and pupils.

Sec. 857, Civil Code, authorizes the creation of a trust to sell real property and apply or dispose of the proceeds in accordance with the instrument creating the trust; and Sec. 1313 provides that no estate, real or personal, shall be bequeathed or devised to any charitable or benevolent society or corporation, or to any person or persons in trust for charitable uses except the same be done by will executed at least thirty days before the death of the testator; and if so made, such devise or legacy shall be valid; which clearly and in terms authorizes a devise or legacy, to a person or persons in trust for such uses as are by the law of this State recognized as charitable uses and for benevolence.

The will of Mr. Hinckley endeavors to create a fund, the income of which shall be devoted to Human Benevolence and Charity; the words charitable and benevolent being the very words used in Sec. 1313. The word "benevolent" has often been construed by Courts to mean the same thing as "charitable," in the law, and trusts for charitable or benevolent purposes have been carried into effect.

Perry on Trusts, Sec. 712.

The next objection is, that the devise for charitable uses is void, because the will attempts to create a perpetuity.

A perpetuity is a limitation of property, such as renders it unalienable beyond lives in being. In this will there is no limitation whatever; no restriction upon alienation. The property is under lease, with a right in the lessees to purchase it, and if the lessees should omit to purchase it, the trustees could sell it, and invest the proceeds in other property.

The residuary legatee also urges that the charitable trust is void for uncertainty, as to mode of execution, and as to the beneficiaries.

The will leaves the mode to the "wisdom, faithfulness, and discretion of the trustees." If the trustees should at any time fail to act with "wisdom, faithfulness, and discretion," there is power to supervise and compel such action, resting either in a Court of Chancery, or in such tribunal as the Legislature may give authority to act in that regard. So, as to the beneficiaries. The selection of the particular persons who are to receive benefit is left to the trustees, so long as the selecting and dispensing be within benevolence and charity. The very term, charity, implies a degree of uncertainty as to the particular persons to be benefited; for, when a testator makes the selection, the bequest ceases to be charitable, in the legal sense, and is direct. "In order that there may be a good trust for a charitable use, the persons to be benefited must be uncertain and indefinite until they are selected to be the particular beneficiaries of the trust for the time being." Perry on Trusts, Sec. 710. The testator calls "attention to the trials and afflictions of the industri-

ous, striving, unfortunate poor, and especially to the aged, the infirm, and the lonely." Is there not enough in those words to indicate to the trustees the direction which the testator desired his bounty to take, and to enable a court to compel the trustees to act accordingly, if such compulsion should be necessary? Most certainly; and that, too, without having to resort to the doctrine of *cy pres*, so thoroughly and learnedly discussed in the argument. It is not necessary in this place to consider the rise of that doctrine, further than to say, that it in great measure had its inception in an assumed prerogative of the King of England, and has been many times used, down to and including Jackson *v.* Phillips, 14 Allen, 539, to make wills for people, and to give direction to the property which could not, by any reasonable construction, have been in the mind of the testator. It may be very much doubted whether the doctrine of *cy pres*, [near to which, as near as may be,] is of any force, in this State, regarding charitable devises, further than to provide machinery for executing the trust, where the machinery named in the will becomes unmanageable or breaks down. It may be resorted to to furnish means for distributing bounty, not to supply the object.

Perry on Trusts, Sec. 728.

It is immaterial how uncertain, indefinite, and vague the beneficiaries of a charitable trust are, provided there is a legal mode of rendering them certain. Thus, a gift to trustees to educate six orphan boys, to be selected and put to school by them, is uncertain, as the boys are uncertain until they are selected. To say that such a trust should fail, and that the heir should take the fund, because there is no orphan boy who can come into court and claim the bequest, would be to subvert the foundation of public charity. In all such cases the heir, or other person interested, may bring his bill to test the legality of the charity, the trustees may bring their bill for instruction, or the attorney-general may bring a bill or information to establish the trust; and if there be any abuse of the trust or mismanagement of the funds, and there be no individual having the right to maintain a

bill, the attorney general, representing the sovereign power and the general public, may bring the subject before a court and obtain perfect redress.

Perry on Trusts, Sec. 732.

The objection as to the $300 per annum, for the Hinckley scholarship is equally untenable. It is a trust to aid some worthy, talented, industrious, and needy young man—which is clearly charitable. The class of persons to be benefited is clearly indicated, and the selection of the person is left with the trustees.

The residuary legatee also objects that even if the devise for charitable uses is good at all, it is void as to the excess over one-third of the estate, that from the aggregate value at the death, the debts must be deducted, and that one-third of the residue is the legal limit of a charitable devise.

Sec. 1313, above referred to, contains the proviso; "that no such devises or bequests [in trust for charitable uses], shall collectively exceed one-third of the estate of the testator leaving legal heirs; * * and all dispositions of property made contrary hereto shall be void, and go to the residuary legatee or devisee, next of kin or heirs, according to law." Under this section, the devise in trust for charitable uses is void as to the excess over one-third of the estate. The value of the estate of Capt. Hinckley, at the time of the appraisal, made within two months after the death, was $135,269.50. *His estate* consisted of that amount of property; not that amount less the debts. Through the entire code, commencing with the first step for administration, *the estate* of the deceased person includes all the property he died seized of ; a portion of which may, or may not be taken to pay debts and expenses, as occasion may require. No testimony was offered to show that the valuation was erroneous; therefore, the Court is justified in taking that as the valuation for the purposes of this opinion. One-third of the $135,269.50 is $45,089.83, which is the extent to which the charitable devise is valid. As there is a devise to the trustees for other purposes than charitable, viz: To pay

$3,000 to each of twelve persons named, the legal title passed to the trustees; they therefore take the title, but they take it in trust, to pay the $36,000 to the persons named, to establish a fund of $45,089.83 for the charitable purposes indicated in the will, and as to the residue there will be a trust in favor of the residuary legatee.

In so far as the devise in the will is in trust for religious purposes, it is void.

Let a decree be drawn, distributing the said California Theatre property (describing it by metes and bounds), together with the lease above mentioned, and all rights reserved in said lease to the lessors, to the said trustees above named (expressing the mode of selecting their successors), subject to the mortgage held by F. H. Woods, in trust for the following purposes, viz:

1—From the income of the said property under the lease aforesaid, or from the capital amount paid by the lessees under said lease for the property, if said lessees choose to pay it according to the terms of said lease, to pay to each of said twelve persons above named, relatives of said deceased, three thousand dollars; such amounts to be paid as soon as may be;

2—Of the remaining part of said property, either under the lease or in capital amount paid by the lessees, as the case may be, the sum of $45,089.83 shall be held by said trustees and their successors in trust to be known as the William and Alice Hinckley Fund, out of the income thereof to set apart $300 per annum, to be known and designated as the Hinckley Scholarship, to be given to some worthy, talented, industrious, and needy young man, who may be pursuing liberal studies, either in the University of this State or in any other school, as the trustees may name, the residue of the income of said sum of $45,089.83, to be devoted to Human Beneficence and Charity; and while arbitrary limits are not set to the wisdom, faithfulness, and discretion of the trustees, their attention is called to the trials and afflictions of the industrious, striving, unfortunate poor, and especially to the aged, the infirm, and the lonely.

3—All the rest and residue of said property, its proceeds, and income, to be paid and delivered to said Mary H. Hinckley, residuary legatee, as soon as the same can be ascertained, paid, and delivered.