STEPHEN FORMAN and others, Appellants, *v.* O. W. SMITH, Executor, &c., and others, Respondents.

7L    443
39 Mis² 66

(GENERAL TERM, THIRD DEPARTMENT, SEPTEMBER, 1872.)

To enable a person to dispose of his property by will, it is not enough that he should be found to be possessed of some degree of intelligence and mind; he must, in addition, have sufficient mind to comprehend the nature and effect of the act he is performing, the relation he holds to the various individuals who might naturally be expected to become objects of his bounty, and to be capable of making a rational selection among them. (Per MILLER, P. J.)

An infirm man, aged eighty-two years, whose mind was impaired, made a will in favor of the family of a son who, for a time, had been a favorite with him, and excluded other children, provided for in prior wills. The will was contested; and the evidence, among other matters, tended to show that the son stood in confidential relations to his father, as his business adviser, and went to live with him less than a month prior to the execution of the will, exercising a controlling influence over him; that other children were excluded from the testator's presence, or not permitted to see him alone, and their conduct and language respecting him presented to him in a most unfavorable and obnoxious light. The evidence was conflicting on the essential points of exclusion, undue influence, &c., and the surrogate admitted the will. *Held*, that his decree should be reversed and a feigned issue awarded.

THIS is an appeal from the decision of the surrogate of Delaware county, made on the 22d of November, 1870,

admitting to probate an alleged will of Henry Forman, deceased. The probate was contested by all the heirs, except Alexander Forman, a son who is the principal legatee and devisee, on the ground of the incapacity of the deceased to make a will, and also that it was not his free and voluntary act and deed, but the result of undue influence.

The facts necessary for a proper understanding of the case appear in the opinion.

*William Gleason,* for the appellants.

*Palmer and Smith,* for the respondents.

Present—MILLER, P. J., POTTER and PARKER, JJ.

MILLER, P. J. The testator died in November, 1868, aged eighty-two years. In the latter part of June or July, 1864, as the testimony shows, he made a will which is not produced, and the contents of which are not fully in evidence, although it appears he devised one of his farms to his only daughter Mrs. Benson, wife of Simon Benson, of Erie, Pennsylvania.

On the sixth of August following he executed another will, by which he devised all his estate to his wife, who was then living, during her life and making her an executrix. And upon the decease of his wife he distributed his estate among some members of his family. The farm which he had devised to his daughter, Mrs. Benson, was given to his grandson, a son of Alexander Forman, and to Mrs. Benson was bequeathed a legacy of $800. He also devised the homestead to his son Alexander, subject to the legacy of $800 to Mrs. Benson, and gave a legacy of $400 to one of the daughters of his deceased son Archibald.

On the 22d of May, 1865, he executed a codicil to his will, in which he bequeathed to his son Gabriel $1,000, to his son Stephen $800, and to a son of Gabriel $500. Also to two of the daughters of Archibald $100 each. All of these were not named in his will of August 6th, 1864.

On the 18th of May, 1867, he executed the will now in controversy, and by this he entirely discarded his two sons Gabriel and Stephen and his grandson Gabriel, and made the wife of Alexander his residuary legatee. Alexander's family, therefore, by this will have all his estate, which is supposed to be of the value of $12,000, except $800 which is bequeathed to Mrs. Benson, and $500 to the children of his deceased son Archibald.

The wife of the testator died on the 5th day of April, 1867. His son Alexander lived near his father, and for some years prior to this time had been evidently a great favorite; exercised considerable influence over him, and it appears that he was his confidential adviser as to business matters. Soon after his mother's death, and on the 15th of April, 1867, he entered into an agreement with his father by which the latter leased Alexander the farm and personal property, and Alexander agreed to provide and take care of him as long as he lived. He took possession under this lease, and remained there until his father's death. The son of the testator, Gabriel B., lived two or three miles from his father, and his son Stephen, who was a physician, three-fourths of a mile, and the children of Archibald (who up to the time of his, Archibald's) death in 1858, was a favorite son of the testator, lived one-quarter of a mile from the testator on a farm owned by him, which he had in his first will devised to Mrs. Benson, and in his last will to Alexander's son.

According to some of the testimony the two sons, Stephen and Gabriel, were not on very good terms with the father, and unfriendly feelings existed between them and Alexander. There is also evidence to show that Alexander, who resided three-fourths of a mile from his father, and on a farm of the latter, prior to the death of Archibald, was in open hostility to the deceased. And he, as well as the other two brothers, at times used very abusive language in regard to their father. Alexander, as some of the witnesses swear, while his brother Archibald was alive, said that his father was not capable of taking care of his property and was giving it all to Archi-

bald. It also appears from some of the testimony, that the deceased's daughter, Mrs. Benson, had differences at one time with her parents which caused unpleasant relations between them. This general statement of the situation of the parties toward their father, which is mainly derived from their own testimony, which, it is proper to say, is not entirely harmonious, as the opposing parties distinctly deny statements made by each other, furnishes some idea of the unfortunate and discordant state of feeling which existed among the members of the testator's family. And it is by no means strange or remarkable that amid so much strife and contention, suspicion, jealousy and selfishness, if the deceased, then at an advanced age, prostrated by disease and overwhelmed by physical infirmities, should have been induced to make a disposition of his property which would do great injustice to some of those who had claims upon him, and who, as his nearest kindred and blood, would naturally be the lawful heirs of his estate.

The will of the testator of May 18th, 1867, which was admitted to probate, is contested upon two grounds :

First. That the testator was incompetent from disease and *dementia* to make a valid will.

Second. That the will was procured by undue influence and restraint, over-persuasion, misrepresentations and gross falsehoods.

A great mass of testimony was taken before the surrogate, and is embraced in the return relating to the two propositions above stated, which I have carefully perused, and it cannot be denied that there is considerable evidence to establish that the testator was not of sufficient capacity to render him competent to make a valid disposition of his estate. The doctrine is well settled, that to enable a person to dispose of his property by will, it is not enough that he should be found to be possessed of some degree of intelligence and mind. He must in addition have sufficient mind to comprehend the nature and effect of the act he was performing ; the relation he held to the various individuals who might naturally be

Forman *v.* Smith.

expected to become objects of his bounty, and to be capable of making a rational selection among them. (*Delafield* v. *Parish*, 25 N. Y., 9, 105.)

The testator was for many years in a feeble state of health, and his mind appears to have been somewhat affected and impaired. A large number of witnesses testify that the testator had not sufficient capacity to comprehend and understand ordinary business transactions; and a larger number, I understand, including his pastor, his family physicians and the subscribing witnesses to the will, give evidence which establishes or tends to prove his competency. The testimony of one of the subscribing witnesses is quite strong as to his understanding the nature of the business transacted. He swears that the will was carefully read over to him, item by item, and that he assented to the various provisions which it contained.

The fact that this will disinherits most of the nearest kindred and relatives is a very strong circumstance to show that the testator was not in possession of all his faculties, so as to appreciate what he did, within the rule laid down in *Delafield* v. *Parish;* but I am not fully satisfied and convinced that he was entirely incompetent and disqualified to make a disposition of his estate, provided he was not improperly controlled by the influence of those by whom he was surrounded.

The question whether undue influence and improper restraint was exercised is more embarrassing; but after a careful examination of the evidence and full deliberation, I am inclined to think that probate of the will should have been refused on this ground if no other. The law carefully guards the aged, infirm and weak-minded against the insidious and persevering efforts of relations who may attempt improperly to control their judgment in the disposition of their property, to the detriment, injury, and sometimes the disinheritance of those who have equal claims upon the bounty of the deceased under ordinary circumstances. It is designed to protect this class of persons, where the facts indi-

cate, as in this case, that the testator is under the immediate control of a single member of his family, to the exclusion of others, and by reason of undue and improper restraint; or, as often happens, by misrepresentation, falsehood and over-persuasion, skillfully employed, he is not permitted to enjoy a free, unrestrained and unbiased exercise of his own volition in making a testamentary disposition of his estate, and his honest intentions are defeated to promote the interest of some favorite, at the expense and frequently to the exclusion of the remainder of his children.

The fact that Alexander Forman, a son of the testator, exercised a controlling influence over him is established beyond any question.    There is also some evidence to prove that Alexander sought to keep the other children of his father from seeing, conversing or having any friendly intercourse with him, except in the presence of himself or some one or more members of his family.    Passing by many circumstances which the testimony discloses, there is some evidence to show that after the deceased had sent for his daughter, Mrs. Benson, to come and see her mother during her last illness, he was induced to countermand the request; and when she did come afterward by special invitation, that she only obtained a private interview with her father after considerable opposition.    There is also proof that the deceased had been wrongly informed and induced to believe that one of his sons had employed the most abusive language toward him, and threatened to burn his house, and made fun of his mother while she lay in her coffin.

If such statements were made to the deceased, it is not difficult to see how his mind may have become imbued with prejudice toward one who had thus disregarded the obligations due from a son to a parent.

It is true, it is denied that any such statements were made; but the questions as to their truthfulness, as well as other matters in regard to which there is much contradiction in the testimony, are a fair subject for investigation and determination upon a trial before a jury.

Forman *v.* Smith.

In this class of cases, a will is set aside or refused probate on the ground that it is not an honest will, that it does not reflect the unbiased intent and wishes of the testator or testatrix, but, on the contrary, has been extorted or procured from the deceased, in the weakness and imbecility of old age or disease, by artifice, deceit, imposition, or by persistent importunity, amounting to a species of coercion or moral duress. (See *Kinne* v. *Johnson*, 60 Barb., 69–75), and authorities cited.)

The fact that the deceased was, as the testimony shows, very much indebted to his son Alexander for attention to his business, for acts of kindness and affection, and regarded him as his confidential adviser, is a very important circumstance upon the question of undue influence. Living as the deceased did in his son's family, and dependent upon him for many comforts and enjoyments at his advanced age, he was exactly in a position to be influenced, imposed upon or intimidated.

The very fact also, that a large portion of property of a deceased person is devised and bequeathed by his will to one standing in a fiduciary relation to the testator, is a strong circumstance to awaken suspicion, if it does not furnish ground for a presumption, that undue influence was exerted or fraud practiced upon the testator in procuring the execution of the will. In *Kinne* v. *Johnson* (*supra*), and as was said in the case cited, " in such case proof should be given to satisfy the court that such position and relation was not abused, and that the will was the clear and free act of the party, unaffected by any improper influence." The burden of establishing undue influence and imposition usually rests with the party who alleges it. While fraud is never presumed and must be established by evidence, it is established when facts are proved from which it results as a necessary inference. And when such evidence is furnished, the burden of repelling the presumption which arises is upon the party who is charged with the fraud. (*Tyler* v. *Gardner*, 35 N. Y., 5?4.)

Direct proof of undue influence can never, or at least but rarely be given, and ordinarily it must be established by cir-

cumstances and inferences, to be drawn from facts and the character of the transaction. These facts could scarcely be known to the subscribing witnesses, who are simply called to attest to the execution and not to prove what usually would be beyond their knowledge. (See *Sears* v. *Shafer*, 2 Seld., 272 ; *Delafield* v. *Parish*, 25 N. Y., 95.)

It also raises a violent presumption of fraud and undue nfluence, where a will executed by an old man differs from his previously expressed intentions, and if it is made in favor of those who stand in confidential relationship to the deceased, which should be overcome by satisfactory testimony. (*Lee* v. *Dill*, 11 Abb., 214.) MORGAN, J., in the case last cited, after laying down the rule that the decedent, who is old and infirm, should be free to choose upon whom he should bestow his bounty, and it should be shown that he was in an independent position, entirely removed from importunities of those who are named as principal beneficiaries, and that he was informed and understood what he was about, observes : " It should not be procured by one or two members of the family while the *other members were beyond the paternal roof, and entirely ignorant of what was doing in their absence.*"

The principles which are established by the cases last cited have a direct bearing upon the facts presented in the case at bar.

As we have seen, the case shows that, long prior to and several years previous to the execution of this will, the testator had made a different disposition of his estate, and in doing so had provided for most if not all his nearest kindred. He thereby recognized their claims upon him, and that he then retained toward them the affectionate regard which was due to the ties of consanguinity which bound them together.

A few days after the decease of his wife he executed a lease to his son Alexander, who had so long been a favored child and his confidential adviser. About one month after the memorable interview with his only daughter, which has been referred to, after he had been, as some of the testimony shows, informed that one of his sons had employed the most

severe and threatening language in regard to him, and treated his deceased wife's memory with derision and great disrespect, and, as is fairly to be inferred, after he had reason to become prejudiced against several of his nearest kindred; at the house of their son, with whom he lived; with that son and his family at home and around him, he executes the will in question. Every other member of the family was ignorant of the proceeding and beyond the paternal roof; not one of them is advised and consulted about it, unless it was the son who with his family were the principal beneficiaries.

No personal friend was called to advise about it, and no one present or at hand besides the draughtsman, the subscribing witnesses, one of whom (a hired servant of Alexander) was only in the room for a few minutes. The whole proceeding is contrary to the usual practice which governs cases of this character, and bears some indications of improper influence and restraint.

True, there is no positive proof that Alexander personally was a direct participator in the business of procuring so great a change in the testator's previous intentions, but the circumstances are such as to create a presumption which, I think, he is called upon to rebut. The burden of proof is upon him to show that his position was not abused.

I have omitted to advert to or discuss many facts which the case presents, which have a direct bearing upon the question considered, which are disputed; but those which are conceded to be true or established by disinterested witnesses, to which I have particularly referred, are quite sufficient to authorize the interference of the court.

There is much to criticise, if not to condemn, in the conduct of most of the parties to this controversy, which, with the conflicting testimony they have given as to many leading facts, presents questions which are peculiarly appropriate for the consideration of a jury upon a trial at the circuit.

Even if it may be urged that the surrogate's decree is not entirely erroneous, I think that a case is presented where there is at least great doubt as to the correctness of his

decision, and where it is not entirely clear that he has not erred. Under such circumstances, and when the case is close and doubtful, it is eminently proper and in accordance with authority to present it to the consideration of another court and jury. (See *Ean v. Snyder*, 46 Barb., 234.)

The order admitting the will to probate must, therefore, be reversed, and an issue awarded to try the questions involved at the next Circuit Court in Delaware county. The costs of this appeal should be paid out of the estate.