## In re BROOKS' WILL.

(Surrogate's Court, Monroe County. December 31, 1909.)

1. WILLS (§ 155*)—UNDUE INFLUENCE—REBUTTAL.

It is no answer to undue influence, resulting from undisputed facts, that testator was aware of the contents of the instrument that he signed, and assented to all its provisions; such being the purpose which the undue influence was intended to accomplish.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*]

2. WILLS (§ 163*)—UNDUE INFLUENCE—FRAUD—BURDEN OF PROOF.

Where a will is claimed to have been the result of fraud and undue influence by the principal beneficiary, and facts are proved from which fraud results as a necessary inference, the burden of repelling the presumption is on the party charged.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

3. WILLS (§ 155*)—UNDUE INFLUENCE—NATURE.

The influence exercised over a testator, which the law regards as undue or illegal, must be such as to destroy his free agency, and is sufficient, without reference to amount, if it has that effect.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*]

4. WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE.

Evidence *held* to require a finding that a will and codicils, offered for probate, were the result of undue influence exercised by testator's son, who was the principal beneficiary, and that they were, therefore not entitled to probate.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

Application for probate of the will and codicils of Garry Brooks, deceased, to which Frances L. Brooks and others filed objections. Objections sustained, and probate denied.

Wm. N. Cogswell, for proponents Brooks and others.
Barker B. Conable, for Mary C. Brooks and others.
Walter S. Hubbell, for Emma J. Saleno.
Werner & Harris, for contestants.

BROWN, S. This proceeding is for the determination of the validity of an alleged will and three codicils thereto, purporting to have been executed by the decedent, Garry Brooks, late of Fairport, Monroe county, N. Y. The will offered for probate was executed on the 28th day of February, 1894, when the decedent was 87 years of age; the first codicil was executed on the 13th day of December, 1895, when he was about 89 years old; the second codicil was executed on the 24th day of December, 1897, when he was 91 years old; and the third codicil was executed February 21, 1899, when he was over 92 years old. The decedent died at Fairport, Monroe county, N. Y., on December 24, 1907, at the age of 101 years, 5 months and 19 days. Objections to the probate of said will and codicils have been filed herein on the part of two of the daughters of the decedent, on the grounds of the incompetency of the testator and of undue influence and fraud practiced

upon said decedent, which led to the execution thereof. To arrive at a proper determination of these questions in this case, and particularly on the question of undue influence and fraud, it is necessary to understand the whole history of the decedent and of his family for some time previous to the execution of said instruments, as well as at the time of their execution.

From the evidence taken herein it appears that Garry Brooks, the decedent, was born in Connecticut on the 5th day of July, 1806, was a tailor by trade, and came to this locality about 18—. It was his good fortune to have a brother, Lewis Brooks, who was a man of large means, and who placed Garry on a farm and from time to time looked after his needs until the time of the death of Lewis Brooks, when Garry became possessed of a third of said brother's estate. Up to this time Garry had shown no aptitude for business or energy in affairs. His family consisted of his wife and three children, all married, one son, Lewis S. Brooks, and two daughters, Mrs. Fannie L. Harris and Mrs. Emma J. Saleno. It was in 1877 that Lewis Brooks died. At or about this time Lewis S. Brooks, the son of Garry, moved to Illinois, where he resided until 1890, generally visiting his father yearly in the summer time. The two daughters were at this time residing in their own homes in the neighborhood of their father. Upon the death of his brother Lewis, Garry asked James Harris (an ex-treasurer of Monroe county, and father of the husband of his daughter Fannie) to act as one of the administrators of the estate of Lewis, telling him at that time that he desired him to act "because he [Garry] was not acquainted with business and did not care to do it." Upon the settlement of the estate of Lewis Brooks in 1878 Garry Brooks became possessed of a large personal estate, mostly invested in stocks and bonds; but there is no evidence here to show that it caused him a spark of elation, or fired his ambition, or aroused him from his lethargy. His wife, many years younger than he, was a woman of energy, method, and high purposes; and he, appreciating her worth, joined with his knowledge of his inexperience and inability in business, allowed her to take charge of his business. She kept account of the transactions of his business, of advancements made to the children, and went to the city of Rochester frequently and attended to the banking and other business matters pertaining to the property of Mr. Brooks. Mr. Brooks seldom went to Rochester after becoming possessed of this property, the evidence shows but once, except it be when passing through the city to go to some other place on a few occasions; one of such occasions being to go to Niagara Falls, and another to the lake beach on Lake Ontario, both of which trips were taken in the lifetime of Mrs. Brooks. He appears to have been a man of routine, not of work, but of existence, driving out regularly while a certain horse lived, usually on the same route or routes, with very little variation, and seldom going beyond four or five miles from home. His wife attended to his correspondence, generally advising him what to do, which advice he readily followed, without any apparent original views of his own. One of the witnesses, who lived for eight years in the family from 1879, and occasionally visited the family afterwards, described the

daily routine of Mr. Brooks' life while she was there in part as follows:

"In the morning he would get up usually later than the others; get to the breakfast table perhaps before we had finished, sometimes after we had finished; after he had finished his breakfast he would walk about the room in the sitting room, and then he would be seated in his accustomed place in the sitting room; later the morning paper would come, and he would read that; perhaps walk about again; sometimes in the morning he would take a ride, and would come back in the sitting room again; have his dinner; then he usually took a nap, * · * * and after that he went for his accustomed drive, and came back and sat down; occasionally walk about the room until he had his supper; in the evening he would sit in the sitting room in his accustomed place. He did not discuss questions of the day, the topics of the times, and the country with me. I can't recall that he ever discussed them. He was rather slow in speech; did not suggest much himself. I can recall of no instance of his transacting business with any person outside. I never saw him do manual work of any kind."

This same witness states that he quoted passages of Scripture and poetry, but that the passages "were always the same ones that I have heard him repeat again and again." He appears to have had a certain few expressions which he repeatedly used, the common ones being "Just so, just so," and "Well, well"; and in summing up his character she described it as follows:

"I think he was the most perfectly passive man I have ever known."

The evidence of this witness also shows that the relations between Garry Brooks and his two daughters were very friendly, and that she never heard him say anything derogatory to his daughters, or of J. Darwin Harris, or of James T. McCartney, or of James Harris. It appears that prior to the death of Mrs. Brooks she looked after the domestic affairs of the family, both inside of the house and outside of the house, including the garden, grape vines, asparagus beds, and repairs and alterations in the house, and everything about the place.

From the testimony of Miss Nettie Reynolds (who commenced living in the Brooks family about March 24, 1884, when she was 14 years of age, and remained there 24 years, until after the death of Garry Brooks, receiving no pay excepting her board and education, living expenses and some spending money) it appears that when she went to live in the family Mr. Brooks was 77 years old; that his eyesight was poor, and he had one defective eye; that he bathed his eyes every day, and afterwards every night; he did not read very much; he read lines in coarse print; he did not read evenings at all; he was inclined to read sermons or any religious items in papers, and the Bible. She states that he would read the headlines in papers and ask her to read the article. He did not read his own correspondence. During the time of Miss Reynolds' residence in the family, he never went out of the vicinity of Fairport but once, and that was to Charlotte, to stay overnight. She further states:

"He did not discuss matters with anybody. His general topic of conversation was the weather, and his health, and how they were, and where they were living, and what they were doing. He very often spoke of his boyhood. He talked about his work in his tailor shop when he was a young man in Connecticut. He spoke of the Episcopal Church choir of which he was a member in Connecticut, and he used to recite poetry and hymns sometimes.

He did not remember the names of early settlers of the town, or what streets were opened when he first came to Fairport."

She further says:

"His memory was very poor on any recent date or any occurrence of recent years."

She also testified that he felt his wife's death very much at first, but very soon seemed to get over it, and did not talk about it at all. Her testimony corroborates that of the other young woman who had lived eight years in the house relative to the affectionate regard that he had for his daughters, and that he treated J. D. Harris and Mr. McCartney well when they came there to family dinners, and she also shows that James Harris used to call there, and was welcome until after Lewis' return from the West. She also states that Mrs. Brooks bought his clothes, and that she never knew of his purchasing any of these articles of clothing for himself. In talking to Mr. Brooks on one occasion, she said to him:

"You don't know the cost or value of a pocket handkerchief, do you?"

And he answered:

"No; I don't."

The evidence in this case clearly shows that Mr. Garry Brooks was a pliable man, who relied upon those around him to take care of him and of his business; that he initiated nothing, and was easily led to follow a plan marked out or suggested for him to follow, by his wife while she was living, unwilling to exert himself, and totally inexperienced in business matters. Both Garry Brooks and his wife were religious people, she, however, the more active and ardent; and she, appreciating the responsibility that people of means owe to religious, charitable, and educational interests, sought intelligently to have some of her husband's means used for such causes. She advised and induced Mr. Brooks to aid in such endeavors, and he made divers gifts to colleges, and one of $30,000 in particular to Oberlin College, to be paid in annual installments of $5,000 each. The amount paid and pledged during the life of his wife—that is, during the 13 years after he became possessed of his fortune, and to the time of his wife's death —was upwards of $40,000, to educational, charitable, and religious purposes.

In 1888 Garry Brooks made a will, which has since been destroyed, but the evidence herein shows that it was executed after consultation with Mrs. Brooks and the daughters, Mr. Harris, Mr. Yerkes, an attorney in Rochester, and Mr. Horace McGuire, another attorney from Rochester, who drew the same and attended the execution thereof at the residence of Mr. Brooks, in the presence of Mrs. Brooks and one or more of the girls. Lewis was at this time in Illinois. By the terms of this will it appears that two legacies of $3,000 each were given to the young women who had lived in and been as members of the family, Kate Barclo and Nettie Reynolds; directions given to pay the balance of the Oberlin gift, in case not paid before; use of the Gates farm to Asher Chauncey and wife during life; a portion of the property left in trust for use of wife during her life, with remainder over

to the three children share and share alike; and balance of estate equally divided between the children. What was the exact form of the will is not certain; but all the evidence agrees in the result that the property was equally divided between the three children after the death of the wife. It appears that Mrs. Brooks so announced, and after her death Lewis S. Brooks told the girls, or one of them, that the property was to pass equally. At the time of making this will testator was 82 years of age. In October, 1889, Mrs. Brooks died suddenly, from an attack of apoplexy, at the age of 67 years.

In 1890 Lewis S. Brooks, the son of the decedent, returned to Fairport and took charge of his father's business. Up to this time the relations between the father and the daughters was affectionate; the daughters and son being treated alike, and in financial matters treated substantially the same, the accounts kept by Mrs. Brooks showing the amounts advanced to each, the variation in amounts being small taking into consideration the amounts involved—something in the neighborhood of $20,000 to each. Mr. Brooks also treated J. Darwin Harris, his son-in-law, and Mr. McCartney (who after the death of the husband of Mrs. Saleno in 1883 became a boarder in Mrs. Saleno's family, upon the suggestion and approval of Mrs. Brooks) well whenever they came to the Brooks household to family dinners or on visits, which were more or less frequent; the annual Christmas dinner being held there down to Christmas, 1892, after which they were discontinued. At the time of the death of Mrs. Brooks good will and fairness appears to have existed and been maintained in the management of the affairs of Garry Brooks, and all of his children were held in equal regard, and all were expected to share equally in the disposition of his bounty, as all substantially had been since the time that he had come into his fortune.

It further appears that, soon after the death of Mrs. Brooks, Mr. Yerkes, a lawyer and friend of the family, who had been consulted by Garry Brooks and the family at the time of the making of the will in 1888, told Garry Brooks that:

"It is not necessary to have any other will made. The conditions of this will cover the ground for the future."

Shortly following the death of Mrs. Brooks, and before Christmas of 1889, it was arranged between members of the family that the son Lewis should return to Fairport and take charge of his father's business in a similar way as his mother had previously done. He was to live on the property owned by the testator on South Main street, Fairport, and was to be paid an allowance of $200 per month by his father. The daughters were also to aid in maintaining the home of the decedent, and Mrs. Saleno, who was a widow, was to receive $100 per month, and Mrs. Harris, whose husband was living, was to receive $60 per month. The three children were to spend alternate nights at the testator's home. About the 1st of January, 1890, the son, Lewis S. Brooks, did return to Fairport with his family, moved into the house on South Main street, and assumed the management and control of his father's estate, and no person other than Lewis, except with the consent or acquiescence of Lewis, had anything to

do with the testator's business interests thereafter. From the advent of Lewis S. Brooks into the management of his father's affairs, a perceptible change in the attitude of Garry Brooks towards religious, charitable, and educational interests appears. From that time to the death of decedent, the payments, aside from those pledges made in the lifetime of Mrs. Brooks, were reduced to less than $300 in any one year, and were entirely disproportionate, comparatively, to his former habits after securing his fortune.

In following the history of Garry Brooks and his affairs under the management and control of Lewis S. Brooks, we find that in May, 1891, Mr. Fairchild, financial secretary of Oberlin College, called on Garry Brooks, and called his attention to the fact that two of the annual installments of his subscription to Oberlin College, aggregating $10,000, were overdue; that is, the two which had become due after the death of Mrs. Brooks. Mr. Brooks replied to Mr. Fairchild, saying he "supposed it had been paid." "Otherwise," Mr. Fairchild says, "his answer was not definite;" and Mr. Fairchild, "went over the ground again with him more particularly and carefully, and he (Mr. Brooks) said that he supposed it was taken care of; that he would look into the matter, and in the course of three or four weeks would send the money to me." Not hearing for some six months from Mr. Brooks, Mr. Fairchild returned to Fairport and again called on Mr. Brooks. This was in November, 1891. After words of greeting the witness states:

"I then approached the matter of the subscription. He hesitated, and I went over the matter again with him, and he said he did not recall what was said on the former visit."

Mr. Fairchild then explained to him "how he and his wife had joined together in founding this professorship, and how they had paid promptly each $5,000, until $15,000 had been paid, and how since his wife's death nothing had been paid, and how that I had called in the spring to call his attention to it, and, not hearing from him, I had called again on the matter. The only reply that he fairly made was that his son was having charge of his affairs," at which Mr. Fairchild said to Mr. Brooks, "I will call upon your son and talk the matter over with him," to which Mr. Brooks assented. Mr. Fairchild then saw Lewis, and told him that he wished he would see his father, and if possible get clearly before his father's mind the situation just exactly as it was, and that, if then his father made any proposition that seemed at all reasonable, etc., he would be back in two weeks and they would look it over. Then on November 26, 1891, Lewis S. Brooks wrote to Mr. Fairchild a letter, of which the following is a copy:

"Fairport, Nov. 26, 1891.

"President J. H. Fairchild—Dear Sir: What I wish is simply this: To pass the interest entirely to make the first five thousand fall due in 1893, the next 1894, and the next and last in 1895. Owing to my income being greatly reduced, and only one-half of what it was, and some of the roads having passed their dividends entirely, it has necessitated my asking this favor. If the board will consider this request favorably, it will enable me to meet my obligations promptly, and greatly oblige.

"Respectfully,　　　　　　　　　　　　　　Garry Brooks."

This letter, Exhibit 29 in this case, is in Lewis' handwriting, and was signed by Garry Brooks. The statements relative to the affairs of Garry Brooks set forth in said letter were not true. The purpose of writing the letter was to save interest on the payments. This incident is an evidence of the influence that Lewis S. Brooks had acquired, even in 1891, over his father, in leading him to sign a false statement. In 1893, after arrangements had been made to have Nettie Reynolds accompany Mrs. Saleno and others to the World's Fair, Lewis commences showing his antipathy to his sister Emma by giving the money which Garry furnished for Nettie to Mrs. Chadwick, instead of Mrs. Saleno. This was a small affair, but it shows the signs of hostility. In May, 1891, a power of attorney was given to Lewis by Garry, giving the same power and control over the property of the testator as the testator might or could have. There is no evidence that this was ever used by Lewis S. Brooks. On May 20, 1891, Lewis S. received a deed from his father of the premises where he lived on South Main street, Fairport, which cost the testator, including improvements and additions, about $12,500. From 1890 to 1894 the mortgages on the farm of Lewis S. Brooks in Illinois to the amount of $5,000 were paid. During this time no advancements or gifts appear to have been made to the daughters.

It appears that before the trip to the World's Fair above mentioned Lewis is shown to have made charges to his father against Mr. James Harris relative to his management of the Lewis Brooks estate. After the Fair he made charges against J. Darwin Harris, husband of his sister Fannie L. Harris, involving his moral character. He also attacked the character of Mr. McCartney, whom he understood his sister Emma might possibly marry, and threatened that if she dared to marry Jim McCartney he would see that she was cut off from her father's will. No good can come from repeating the stories and insinuations which Lewis retailed to his father. The evidence shows, however, that he was telling things about the daughters, the husband of one of them and the friend of the other, derogatory to them, and the testimony of Lewis S. himself, while not entirely in accord with the testimony of some of the other witnesses, is to a great extent corroboratory of the carrying on of such conversations with his father. These charges have been proven to have been absolutely false. It conclusively appears from the evidence that these attacks and charges of Lewis, related to his father, had some influence on him, and Lewis testified that the condition of things relative to Mrs. Saleno and Mr. McCartney concerning which he and his father had talked made his father sore, and that his father threatened to cut them off because of the condition of affairs talked over between them. After having the family affairs wrongly and wrongfully portrayed and rehearsed by him before his father, while in full control of his father's business, without consultation with other members of the family, Lewis S. Brooks takes the will of 1888, about the 28th of February, 1894; and with prepared instructions signed by his father goes to the office of William F. Cogswell, one of the leading lawyers of Rochester at that time, and a will was drawn. Mr. Cogswell did not see Garry

Brooks at that time. No criticism can be made of Mr. Cogswell in this matter, or in the subsequent codicils drawn by him, as Mr. Cogswell had no reason to believe but that Lewis S. Brooks was carrying out the free and unrestrained will of his father. Said instrument, purporting to be the will of Garry Brooks, was signed by Garry Brooks on the 28th day of February, 1894, at his residence, under cover of darkness, when no members of the family were present except the old man and Lewis. Nettie Reynolds, the housekeeper, was even away. Witnesses were brought from the village, who testified to the execution and declaring of the will, but add no light upon the transaction, other than the formal fact of execution. Mr. Cogswell had never seen Garry Brooks—had never before done any business for him. He had, however, done business for Lewis S. Brooks.

This will, executed on the 28th day of February, 1894, provided that his wearing apparel, household furniture, and household effects be divided into three equal parts in value, and gave one of the parts to each of his children. He bequeathed $1,000 to Kate Barclo, and a similar amount to Nettie Reynolds. He gave the Rochester Trust & Safe Deposit Company in trust 800 shares of New York Central & Hudson River Railroad Company stock and 700 shares of Chicago, Burlington & Quincy Railroad Company stock, for the following purposes: To divide the said stock into three equal parts, and to pay the income of one of the parts to his daughter Fannie Louise Harris during her life, and in case of her death before the death of the other children, Emma and Lewis, then to pay over the income to Emma and Lewis in equal shares until one of them died, and upon the death of either Emma or Lewis to divide said stock so bequeathed to the said Fannie Louise Harris into as many parts as Lewis should leave children and deliver said stock to said children respectively. The will then provides that the income from another of said parts shall be paid to his daughter Emma J. Saleno during her life, with a similar provision in case she should die before the death of her sister and brother, as in the preceding clause, and substituting Fannie for Emma, in case of Emma's death before Fannie and Lewis. The will further directed that the income from the third part should be paid to Lewis S. Brooks during his lifetime, and upon his death, if he died before his wife, the income should be paid to his wife, and upon her death should be divided among the children of Lewis S. Brooks. The balance of his estate was devised and bequeathed as follows. One-third of the real and personal to his son Lewis S. Brooks absolutely. One-third to the Rochester Trust & Safe Deposit Company, to pay the income thereon to Fannie Louise Harris until the death of her husband, J. Darwin Harris. In case she survived her husband, then she was to have one-third absolutely; but if her husband should be living at the time of her death, then the one-third was to be paid over to Lewis S. Brooks, or, in case he was not then living, then to the heirs of his blood. The remaining one-third of the residue he devised and bequeathed in trust to the Rochester Trust & Safe Deposit Company, with directions to pay the income thereon to his

daughter Emma J. Saleno. If she survived James McCartney, then that one-third was to be hers absolutely. If she died prior to the death of James McCartney, that one-third was to be transferred to his son Lewis S. Brooks, or in case he should not be living at that time, then to the heirs of his blood. The will further authorized the Rochester Trust & Safe Deposit Company to sell and dispose of the stocks which had by the terms of the will been bequeathed to it in trust, "with the consent in writing of my son Lewis S. Brooks," and to invest the same in other good dividend paying stocks or in mortgages upon real estate.

On December 15, 1895, an alleged codicil is prepared under instructions alleged to have been sent through Lewis from his father to Mr. Cogswell, which gave Lewis absolutely the farm in Gates, valued at about $10,000. This was executed at night, when no one was in the house except Garry, Lewis, and the two witnesses brought there by Lewis. On December 24, 1897, a second codicil to said will was executed, which required the daughters of the testator to receive their payments from the trustee under the will personally, and not by check or assignment. Any attempt to transfer the rights to such moneys by check or assignment to any other person operated to defeat the right of the person making such attempt. It also provided that, in case any legatee might contest said will, the property given to them under the terms of the will was revoked, and the property otherwise coming to them is given to the other legatees. This codicil was executed with the same secrecy as the will and previous codicil; no one being in the house at the time, except Garry, Lewis, and the witnesses brought there by Lewis. Again on February 21, 1899, the third alleged codicil is executed, with the same secrecy and by similar methods. It provided:

"If at the time of my death I may not have the number of shares of stock of the two companies mentioned in the fifth paragraph of my will, the deficiency of said shares shall be made up in money at the par of said stocks."

From the time Lewis came back from the West the testator never talked of his business with his daughters. Generally the door was shut between the room where the father was and the room where the other members of the household were when Lewis was talking business with him and either of the daughters were present in the house. We find that in 1891 the testator's memory was so poor that he did not remember and could not understand that he had paid to Mrs. Saleno a note of $1,700, although the note was in his possession, and to explain this matter Mrs. Saleno wrote a letter to her father, showing that the note had been paid by the father, and adding in the letter: "It is not necessary to watch Lew. I will trust him." This episode shows deficiency in memory of the old gentleman of an important business transaction with his daughter, his inability to readily understand an old transaction with the papers in his possession, his unwillingness to accept Lewis' statement that said note was paid, or the failure to understand the statement, and his confidence in Mrs. Saleno, and also shows the confidence and trust then reposed by Mrs. Saleno in Lewis. From 1890 to 1894 Lewis S. Brooks falsely attacked religious, charitable, and educational institutions which formerly had been the objects.

of his father's bounty. Lewis visited his father daily, generally twice a day, and had complete control of his father's business. He conferred with his father, but the general management was in Lewis. To be sure, there is some evidence of Garry revoking or reconsidering some actions of Lewis on two occasions; but the only evidence of them is testimony of Lewis, and are of no weight to show any regular independent action on the part of Garry. The very makeup, condition, and conduct of Garry from the time of his wife's death, and for sometime before, negatives any such independent action on his part.

Now, coming to the provision of the wills and codicils themselves, the will and two of the codicils, Nos. 1 and 2, are detrimental to the interests of the daughters, a hardship upon them, and one of them, the second, contains a drastic provision which had the purpose and intent to induce them to submission to the terms of the will and codicils, all of which did not provide an equal division of testator's property between his children in accordance with his fixed purpose formed before the death of his wife, and that continued after her death, as appears by his acquiescence therein when told by Mr. Yerkes, shortly after the death of Mrs. Brooks, that the will was all right for all time. Then we find a changed purpose and plan, purporting to be developed by an old man, weak in memory, without any reason appearing for it, except through the influence brought upon him by false suggestions made by his son Lewis against the husband of one of the daughters; false statements relating to business transactions of said daughter; false suggestions to the father by said son against the other daughter and the man whom she desired to marry; the instruments making such change prepared through the intermediary of Lewis S. Brooks, the son, the confidential manager of testator; the conferring with said son's attorney, with said attorney having no opportunity of personal converse with the testator; the secrecy with which all the instruments were executed; the allaying of suspicion by Lewis telling Mrs. Saleno that the property would be equally divided—all these things, taking into consideration the inaction of the testator, as clearly shown herein, his susceptibility to being led by Lewis, even to the making of testamentary provisions, bring this case under the cases that require the proponent to show that such instruments are the free, untrammeled, and unrestrained act of the testator. The last codicil was a matter of detail, which, in the judgment of the court, from the evidence of the character of the testator, would never have been thought of by him but for the efforts and influence of Lewis, and falls under the same ban as the others. Lewis' influence over his father and his avariciousness relative to his father's estate is clearly shown by a large amount of property having passed from Garry to Lewis; a portion of it being claimed as a gift from Garry to Lewis, one item, amounting to $100,000 of bonds, or the rights thereto, transferred from Garry to Lewis.

The fact that Garry Brooks allowed six years to intervene between the time of the making of the will in 1888, while his wife was alive, and the time of the making of the new will, taken in connection with the fact that it was about a year or less before the making of the new

will that it appears that Lewis was poisoning the mind of his father against the daughters by making false charges against the daughters and the husband of one and Mr. McCartney, who boarded in the house of the other, tends to establish the fact that it was not Garry Brooks, but Lewis Brooks, who desired the change of will, and that it was the influence thus brought to bear by Lewis that led to the making and execution of the will of 1894. The further fact that in the will of 1894 the legacies to Kate Barclo and Nettie Reynolds were reduced to $1,000 in lieu of $3,000 in the previous will, when no reason is shown for making any such reduction, considering the condition of the property of the testator, and particularly as to Nettie Reynolds, who was still faithfully serving the old gentleman, and caring for his household and himself, shows again the influence of Lewis, whose policy appears to have been to cut down everything going to any member of the family except himself and his own immediate family. The secrecy with which this will and the codicils were prepared and executed, and the evident pains taken that no one should know of their execution except · those necessary to witness the same, is a significant matter for consideration in studying this case.

In the case of Mowry v. Silber, 2 Bradf. Sur. 133, the court said:

"There is no evidence that the fact of its execution was known to any member of the family until after Mr. Silber's death. If the will was made by Mr. Mowry's procurement, this is not singular; but that the decedent should not have divulged it is more remarkable. * * * An old man of decayed mind, the father of children equally the just objects of his bounty, should not have been permitted to perform such an act without every care taken to show that it was his own desire and not another's device. His children should have known it. There should have been no secrecy."

In the proceeding before us the children were equally entitled to their father's bounty, and the decedent did not divulge the making of the new will to the children, aside from the one that was connected with the preparation of the will; and that child sought to make one of the daughters, with whom he had conversation relative to his father's property, believe that the division of the property was equal, without even intimating that any new will had been drawn. In Tyler v. Gardiner, 35 N. Y. 569, it appears that the testator had been for some time under the controlling influence of the principal beneficiary, that she had acquired an unreasonable prejudice against her only son, that the will originated with the chief beneficiary, who engaged the counsel who drew it and superintended the execution of it, and that it showed a change of intention from that indicated by previous wills. The court says:

"The will was made by the testatrix under two false impressions, which went to the very root of its provisions; one that her daughter was poor, and the other that her son was faithless and dishonest, and that he had purchased his farm with her money." Page 593. "It is not to be supposed that fraud and undue influence are ordinarily susceptible of direct proof. Subscribing witnesses are called to attest the execution of wills, but not the antecedent agencies by which they are procured. The purposes to be served are such as court privacy rather than publicity." Page 594. "It is no sufficient answer to the presumption of undue influence, which results from the undisputed facts, that the testatrix was aware of the contents of the instrument and assented to all its provisions. This was the precise purpose which the undue influence was employed to accomplish." Page 595.

The facts in the case at bar fall almost precisely under the case of Tyler v. Gardiner—false impressions given to the testator, which impressions affected the testator, which caused the testator to make a will substantially different from a previous will.

Counsel for the proponent has called our attention to the fact of the exhibit here, signed by Garry Brooks, which was sent to William F. Cogswell, by Garry, through Lewis, containing a statement or inventory of his property, on July 31, 1903, calling attention to the fact that this shows capacity and understanding. While this may show some understanding of Garry Brooks as to what property he had at that date, and while it may further show that he was satisfied with the condition of his affairs as of that date, as shown by said statement, it does not in the least show, or tend to show, the free or unrestrained act of the testator in the making of his will and codicils. The same influence that directed and brought to pass the execution of the will and codicils prepared the statement, and, whether true or false, might equally well have secured the signing of the statement, the same as he did years before secure the signing of a false statement in the letter to President Fairchild. All that can be said of that statement, if Garry Brooks understood it when he signed it, is that he was satisfied with the management of Lewis relative to the handling of his property, and, aside from the question of undue influence, was an acknowledgment of the amount of his property as understood by himself. The court is of the opinion that Garry Brooks never would have prepared, or had prepared, or signed, such a statement at the time that he did, except through the intimation and desire, request, and planning, of Lewis S. Brooks, or some other person who might have been at that time in equal control and influence over him.

"While fraud is never presumed, and must be established by evidence, it is established when facts are proved from which it results as a necessary inference; and, when such evidence is furnished, the burden of repelling the presumption which arises is upon the party who is charged with the fraud." Forman v. Smith, 7 Lans. 443, 449.

In Swenarton v. Hancock, 9 Abb. N. C. 326, the court says, at page 363:

"It is not indispensable that the precise time of practicing the imposition, exerting the coercion, or committing the fraud should be proved. If the circumstances attending the act raised a legitimate presumption of fraud, it is proper so to find in the absence of sufficient information; for it is rarely the case that direct evidence can be furnished that undue influence has been exercised over the mind of a testator in the execution of a testamentary instrument. The act is what is seen and tangible, while the moving and approximate motive and cause may be subtle and altogether hidden."

In Rollwagen v. Rollwagen, 63 N. Y. 504, at page 519, Judge Earl in his opinion says:

"But the influence exercised over a testator, which the law regards as undue or illegal, must be such as to destroy his free agency; but, no matter how little the influence, if the free agency is destroyed, it vitiates the act which is the result of it. * * * The undue influence is not often the subject of direct proof. It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the con-

dition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person."

The propositions set forth in the three foregoing cases apply to this proceeding, and sustain the view of this court as to the proper decision in the case before us. We are of the opinion that, although Garry Brooks was old and feeble and more or less weak in mind and memory from 1891 to the time of his death, yet, in the contemplation of the statute, he was of sound mind and memory and capable under proper and free conditions and surroundings to execute a last will and testament. We are of the opinion, however, that he was susceptible to influence; that he was unduly influenced by Lewis S. Brooks, both by charges made against Mr. J. Darwin Harris, the husband of his daughter Fannie, and charges made against Mr. McCartney, whom his daughter Emma desired to marry; that he was further unduly influenced by Lewis by false suggestions and insinuations made against both Mrs. Harris and Mrs. Saleno; that those suggestions influenced the old gentleman in the making of his will and codicils thereto, and that the will and codicils thereto made were detrimental to the interests of said two daughters; that said influence exerted upon the said testator by Lewis was a fraud perpetrated on said Garry Brooks and upon said two sisters; and that proponents have failed to satisfy the judicial mind of this court that such will and codicils were the free and unrestrained act of the testator.

In recapitulation, I find that the testator died at Fairport, in the county of Monroe, and state of New York, on the 24th day of December, 1907, leaving a last will and testament and three codicils thereto, offered for probate herein, duly executed in the presence of two witnesses, and declared to said witnesses as his last will and testament and codicils, respectively, and signed by said witnesses respectively in the presence of the testator; that at the time of making said will and codicils the testator was of sound mind and memory and capable of making a will; that said will and codicils were not the free and unrestrained act of the testator, but were executed through the fraud and undue influence of Lewis S. Brooks, practiced upon Garry Brooks, the decedent, in procuring the making and execution thereof.

I find as conclusions of law: That the said will and three codicils thereto, offered for probate herein, is not the last will and testament of the said testator, and should be denied probate. Costs and disbursements are allowed to the trustee named in said will, and costs and disbursements to each of the contestants who have appeared herein, and allowance and disbursements to the special guardian appointed for the infants herein, payable out of the estate, and to be taxed and allowed upon the settlement of the findings herein, together with a further allowance to the special guardian, payable out of the share of the infants represented by said special guardian in said estate, to be fixed at the same time.

Let findings be settled, according to the foregoing decision, upon five days' notice, and decree entered thereon, with costs and allowances as hereinafter taxed or allowed; as above directed.